# In re V-T-S-, Respondent

*Decided March 6, 1997*

U.S. Department of Justice
Executive Office for Immigration Review
Board of Immigration Appeals

(1) Although kidnapping is a very serious offense, the seriousness of conduct is not dispositive in determining persecution, which does not encompass all treatment that society regards as unfair, unjust, or even unlawful or unconstitutional.

(2) While there may be a number of reasons for a kidnapping, an asylum applicant bears the burden of establishing that one motivation was to persecute him on account of an enumerated ground, and evidence that indicates that the perpetrators were motivated by the victim's wealth, in the absence of evidence to suggest other motivations, will not support a finding of persecution within the meaning of the Immigration and Nationality Act.

FOR THE RESPONDENT: Russell L. Marshak, Esquire

FOR THE IMMIGRATION AND NATURALIZATION SERVICE: Tamila Marshall, Assistant District Counsel

BEFORE: Board En Banc: DUNNE, Vice Chairman; VACCA, HEILMAN, HOLMES, HURWITZ, VILLAGELIU, FILPPU, COLE, and MATHON, Board Members. Dissenting Opinions: SCHMIDT, Chairman; joined by GUENDELSBERGER, Board Member; ROSENBERG, Board Member.

HURWITZ, Board Member:

In a decision dated December 4, 1995, an Immigration Judge determined that deportability on the charge set forth above was established by clear, unequivocal, and convincing evidence. The Immigration Judge denied the applications submitted by the respondent for asylum and withholding of deportation pursuant to sections 208(a) and 243(h) of the Immigration and Nationality Act, 8 U.S.C. §§ 1158(a) and 1253(h) (1994), but granted the respondent's request for voluntary departure under section 244(e) of the Act, 8 U.S.C. § 1254(e) (1994). The respondent timely appealed the decision of the Immigration Judge. The appeal will be dismissed.

The respondent is a 36-year-old native and citizen of the Philippines who entered the United States at Los Angeles, California, on March 17, 1991, as a visitor for pleasure, authorized to remain in the United States until September 17, 1991.

The respondent argues on appeal that the Immigration Judge erred in denying his applications for asylum and withholding of deportation. He contends that his involvement in political demonstrations caused a guerrilla group, the Moro National Liberation Front ("MNLF"), to threaten him and kidnap two of his siblings.

## I. FACTS

The respondent testified that he is a native of Mindanao, an island located in the south of the Philippines. He stated that he was a college student in Manila from 1976 until 1982. He said that he was an "activist" in college and that he was a member of a student council, a group comprised of a "majority" of members from Mindanao, between 1981 and 1982. The respondent explained that he participated in five or six demonstrations with "100-150" other people. According to his testimony, the demonstrations were intended to cause the government to increase the military presence in Mindanao "[b]ecause there were a lot of businessmen there who received extortion letters" from Muslim groups. The respondent testified that he was not involved in any political activity once he returned to Mindanao in 1983.[1]

The respondent indicated that a photograph of one of the demonstrations appeared in a nationally distributed newspaper in 1982, shortly before he graduated and returned home in 1983 to work in his father's business. According to the respondent, the MNLF recognized him from the photograph and sent him a series of threatening letters beginning in 1983. The respondent testified that the MNLF threatened to kill him because of his anti-MNLF political activities. The respondent indicated that he told his father about the first letter and that his father told him that he would receive many more similar letters. The respondent explained that his father had received similar letters from the MNLF since the mid-1970's. He said that his father advised him to throw the letters away and not pay any attention to them.

The respondent testified that he received two additional threatening letters in 1984 and two more in 1985. He stated that the next letter he received was on November 3, 1990, following the kidnapping of his older brother. A copy of the 1990 letter appears in the record. The letter is purportedly from the Commanding Officer of the MNLF. The author indicates that the MNLF will continue to pursue the respondent anywhere in the Philippines. According to the respondent's testimony, the MNLF determined that the respondent was too well guarded, so they kidnapped two of his siblings who were also living in Mindanao.

The respondent submitted a collection of newspaper articles that provide detailed accounts of his brother's kidnapping in 1989, and his sister's kidnapping in 1991. According to the newspaper accounts, the respondent's brother

---

[1] Manila is located approximately 500 miles from the island of Mindanao.

was rescued by members of the Philippine Army a few hours after he was kidnapped by members of the MNLF lost command, who left a ransom note for the family to pay 3.5 million pesos. The report indicates that the military rescue resulted in the death of several kidnappers.

The respondent also submitted newspaper articles that describe his sister's kidnapping. According to newspaper accounts, she was kidnapped along with her husband and two children in 1991. One newspaper account acknowledges that a joint police and military rescue team was formed immediately after her capture to facilitate her release. The respondent's sister and her family were released unharmed 13 days later when a ransom for their release was paid.

The respondent testified that he planned to stay in the United States for 6 months, but when he learned that his sister had been kidnapped he feared returning and sought asylum. He indicated that his parents and his 11 siblings continue to reside in the Philippines.

The respondent also submitted newspaper accounts that provide generalized information on the Philippines. These accounts indicate that kidnapping for ransom is widespread in Mindanao. They describe kidnappings for ransom of prominent businessmen and children of other Filipino-Chinese businessmen. According to the articles proffered by the respondent, the MNLF and the military continue to engage in hostilities even though the two groups are pursuing peace talks.

The record also contains two letters submitted by the respondent. The first document is a photocopy of a letter dated November 3, 1990, and is purportedly from the commanding officer of the MNLF. The body of the letter is written in the Cebuano language and contains a sentence written in English. The symbol of the MNLF appears on the letterhead. The author of the letter states that the MNLF sought to kidnap the respondent, but was unsuccessful because he was constantly protected by personal guards. The letter, which contains the signature "Datu Mohamad Makmud, Commanding Officer," states that the MNLF targeted the respondent's brother only because the respondent was too heavily guarded.

The second letter is dated November 23, 1994, and is printed on a letterhead of the Moro Islamic Liberation Front ("MILF"). The letter is not addressed to any specific individual, but instead is addressed to "The President" of the respondent's father's business. The author begins the letter by stating, "Peace be unto You!" and goes on to describe the ongoing peace talks between the MILF and the government. The author then makes a request for "revolutionary or corporate taxes" in a similar amount to their "counterpart, the MNLF."

Also included in the record is a country profile prepared by the Department of State, Bureau of Democracy, Human Rights and Labor, U.S. Dep't of State, *The Philippines—Profile of Asylum Claims & Country Conditions* (Dec. 1994) [hereinafter *Profile*]; *see also* 8 C.F.R. § 208.11(a) (1996). The

*Profile* reveals that the government announced an amnesty in 1993 for 4,000 insurgents and military rebels and has signed decrees in June 1994 enabling Muslim separatists and other groups to apply for amnesty. *Profile, supra*, at 2. According to the *Profile*, the amnesty does not apply to criminal activity such as kidnapping. *Id.*

The *Profile* also addresses the plight of wealthy businessmen of Chinese ethnicity as follows:

> Recent incidents also suggest that police, customs and other government officials, reportedly in collusion with judges, have made Filipino-Chinese businesses a target of their extortion schemes. Apart from extortion, wealthy Filipino-Chinese have been the targets of kidnappings-for-ransom by criminal elements, often with the reported involvement of police and/or military officials. . . . The problem is particularly serious in Mindanao.

*Id*. at 5.

## II.  APPLICABLE STANDARDS

An applicant for asylum bears the evidentiary burdens of proof and persuasion in any application for asylum under section 208 of the Act. *Matter of Acosta,* 19 I&N Dec. 211 (BIA 1985), *modified on other grounds, Matter of Mogharrabi,* 19 I&N Dec. 439 (BIA 1987); 8 C.F.R. §§ 208.13(a), 242.17(c)(4)(iii) (1996). To establish eligibility for a grant of asylum, an alien must demonstrate that he is a "refugee" within the meaning of section 101(a)(42)(A) of the Act, 8 U.S.C. § 1101(a)(42)(A) (1994). *See* section 208 of the Act. That section defines "refugee" as any person who is unable or unwilling to return to her home country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.

An applicant for asylum has established a well-founded fear if he presents specific facts establishing that he has actually been the victim of persecution or if he shows that a reasonable person in his circumstances would fear persecution if he were returned to his native country. *INS v. Cardoza-Fonseca,* 480 U.S. 421 (1987); *Matter of Mogharrabi, supra*. An asylum applicant must also demonstrate that he merits such relief as a matter of discretion.

An alien's testimony may be sufficient to prove persecution where that testimony is believable, consistent, and sufficiently detailed to provide a plausible and coherent account of the basis of his claim. *See Matter of Dass,* 20 I&N Dec. 120 (BIA 1989); *Matter of Mogharrabi, supra*. An alien may also establish statutory eligibility for asylum by demonstrating that he was persecuted in the past on account of political opinion or any of the other grounds enumerated in the Act. *Matter of H-,* 21 I&N Dec. 337 (BIA 1996); *Matter of Chen,* 20 I&N Dec. 16 (BIA 1989); *see also Matter of D-V-,* 21 I&N Dec. 77 (BIA 1993); *Matter of B-*, 21 I&N Dec. 66 (BIA 1995); 8 C.F.R. § 208.13(b).

An alien who seeks withholding of deportation from any country must show that his "life or freedom would be threatened in such a country on account of race, religion, nationality, membership in a particular social group, or political opinion." Section 243(h)(1) of the Act. In order to make such a showing, the alien must establish a "clear probability" of persecution on account of one of the enumerated grounds. *INS v. Stevic*, 467 U.S. 407 (1984).

Persecutors may have differing motives for engaging in acts of persecution, some tied to reasons protected under the Act and others not. *See, e.g., Matter of S-P-*, 21 I&N Dec. 486 (BIA 1996). Proving the actual, exact reason for persecution or feared persecution may be impossible in many cases. An asylum applicant is not obliged to show conclusively why persecution has occurred or may occur. "[A]n applicant does not bear the unreasonable burden of establishing the exact motivation of a 'persecutor' where different reasons for actions are possible." *Matter of Fuentes*, 19 I&N Dec. 658, 662 (BIA 1988). Rather, an asylum applicant "bear[s] the burden of establishing facts on which a reasonable person would fear that the danger arises on account of his race, religion, nationality, membership in a particular social group, or political opinion." *Id.; see also INS v. Cardoza-Fonseca, supra* (explaining the "well-founded fear" standard embodied in the "refugee" definition).

## III. ANALYSIS

### A. Credibility Finding

The Board ordinarily will not disturb an Immigration Judge's finding concerning the credibility of a witness, since the Immigration Judge has the advantage of observing the alien as he testifies. *See, e.g., Matter of Burbano*, 20 I&N Dec. 872 (BIA 1994); *Matter of Kulle*, 19 I&N Dec. 318 (BIA 1985), *aff'd*, 825 F.2d 1188 (7th Cir. 1987), *cert. denied*, 484 U.S. 1042 (1988). Here, the Immigration Judge failed to make an explicit credibility finding. Although the Immigration Judge determined that the "respondent's evidentiary presentations [were] riddled with alterations and inconsistencies which do not speak well of his credibility," he "declined to specifically conclude that the respondent" gave false testimony. Therefore, we review the record de novo on the issue of the respondent's credibility. *See generally Artiga-Turcios v. INS*, 829 F.2d 720, 723 (9th Cir. 1987); *Damaize-Job v. INS*, 787 F.2d 1332, 1338 (9th Cir. 1986).

We find that the respondent's testimony was not wholly consistent, especially as to the extent of his participation in student demonstrations and his receipt of letters allegedly sent by the MNLF. However, his testimony regarding his family and their physical encounters with members of the MNLF is both internally consistent and supported by documentary evidence, and therefore we credit that part of his claim.

The Immigration Judge also questioned the reliability of a letter dated November 3, 1990, allegedly sent to the respondent by the MNLF. We find that the Immigration Judge expressed valid concerns as to the origins of the letter, its method of delivery, its author, and the inability of the respondent to explain why this letter was selectively saved when other letters he claims were sent to him by the same group were thrown away as not worthy of attention. Accordingly, we find that the respondent has failed to adequately demonstrate the authenticity of the November 3, 1990, letter.

## B. Persecution "on account of" the Respondent's Political Opinion

We find first that the respondent has failed to demonstrate a nexus between the threats he received and his participation in political demonstrations. The respondent stated that he participated in five or six demonstrations during 1981 and 1982, yet he indicated that he did not receive a threatening letter from the MNLF until a year after he had stopped engaging in political activity. He asserts specifically that the MNLF, located in Mindanao, sent him a threatening letter based upon a single photograph in a nationally circulated newspaper of a demonstration he participated in with 150 other college students a year earlier in Manila. However, neither the newspaper article nor the letter were produced by the respondent. Furthermore, he has failed to establish a plausible basis for the MNLF's ability to establish his identity from the photograph or to explain why the MNLF waited a year to send him the letter.

Similarly, the respondent has failed to establish any reason why the MNLF would continue to have an interest in him for 14 years after his political activity had ceased when he finished college in 1982. The respondent claimed that he received one or two letters per year thereafter in which the MNLF threatened to harm him if he did not leave Mindanao. His claim that the MNLF continued to seek him out to force him to leave Mindanao despite his absence of political activity is unpersuasive.

Finally, we note that the respondent has failed to establish that he actually received the threatening letters. As noted above, the sole letter submitted by the respondent lacks credibility. Moreover, the respondent has failed to present any corroborative evidence of the alleged letters' existence, or the frequency of their receipt, or their content. The persuasiveness of his testimony is weakened by the absence of corroboration when corroboration apparently was available to him. *Matter of Dass, supra.* At a minimum, the respondent could have obtained an affidavit from his father, who the respondent testified saw the letters.

### C. Persecution "on account of" the Respondent's Membership in a Particular Social Group[2]

#### 1. Filipinos of Chinese Ancestry as a Particular Social Group

In order for the respondent to establish eligibility for relief based upon his membership in a particular group, he must establish that the group is cognizable as a "particular social group" under the Act and that he possesses the traits that make the group cognizable. *See, e.g., Sanchez-Trujillo v. INS*, 801 F.2d 1571, 1573-75 (9th Cir. 1986). As we held in *Matter of Acosta, supra*, at 233, "persecution on account of membership in a particular social group" refers to persecution that is directed toward an individual who is a member of a group that share common immutable characteristics. These are characteristics that members of the group either cannot change, or should not be required to change, because such characteristics are fundamental to their individual identities. *Matter of Kasinga*, 21 I&N Dec. 357 (BIA 1996). The characteristics of being a Filipino of mixed Filipino-Chinese ancestry cannot be changed and are therefore immutable. According to the *Profile*, "[a]pproximately 1.5 percent of the Philippine population has an identifiable Chinese background." *Profile, supra*, at 5. For the reasons stated above, we find that the defined social group meets the test we set forth in *Matter of Acosta, supra,* at 233. *See also Matter of H-, supra* (finding that identifiable shared ties of kinship warrant characterization as a social group).

#### 2. Kidnapping as Persecution

Kidnapping is a very serious offense. Seriousness of conduct, however, is not dispositive in our analysis. Instead, the critical issue is whether a reasonable inference may be drawn from the evidence to find that the motivation for the conduct was to persecute the asylum applicant on account of race, religion, nationality, membership in a particular social group, or political opinion. "Persecution" within the Act does not encompass all treatment that society regards as unfair, unjust, or even unlawful or unconstitutional. *Fatin v. INS*, 12 F.3d 1233 (3d Cir. 1993).

While there may be a number of reasons for a kidnapping, the respondent bears the burden of establishing that one motivation was to persecute him on account of an enumerated ground. It is difficult to ascertain the motivation of the kidnappers in the respondent's brother's abduction because the plot was foiled prior to its completion. The evidence indicates, however, that the perpetrators were motivated by a large ransom. According to newspaper accounts submitted by the respondent, the kidnappers demanded 3.5 million Filipino pesos as ransom for the return of his brother. Money was therefore

---

[2] The respondent's claim on appeal is based on political opinion. He does not press a claim based on race/membership in a social group. However, as the dissents stress this point, we will address the issue.

one of the reasons for the kidnapping, and the evidence does not suggest that other motivations existed.

The second kidnapping provides a better insight into the motivations of the kidnappers because the process was fully completed. The respondent's sister and her family were released by the kidnappers when their ransom demands were met. The evidence does not suggest that the respondent's abductors kidnapped his sister because she is Chinese or that her abductors attempted to harm her family because of her ethnicity. Rather, her release was in exchange for money, which leads to the reasonable inference that her kidnapping was motivated because of her family's ability to pay a ransom. This conclusion is consistent with the evidence indicating that the targets of kidnappers are not just wealthy Chinese, but rather wealthy business people in general. The common trait shared by the victims of kidnappings in the Philippines is wealth, i.e., their ability to pay large ransoms. There has been no animus shown by the MNLF toward Filipinos of Chinese ancestry because of their ethnicity. Therefore it has been not shown that a reasonable inference may be drawn that the kidnappings were motivated by a desire to persecute on account of one of the statute's enumerated grounds.

Moreover, the inference that kidnappers are motivated by money, and not on account of any of the five enumerated grounds, is consistent with the opinion contained in the *Profile* submitted by the Department of State. The *Profile* reveals that "*wealthy* Filipino-Chinese have been the targets of *kidnappings-for-ransom* by criminal elements." *Profile, supra*, at 5 (emphasis added). Moreover, we note that country condition profiles developed by the State Department have been found to be "'the most appropriate and perhaps the best resource'" for information on conditions in foreign nations. *Kazlauskas v. INS*, 46 F.3d 902, 906 (9th Cir. 1995) (quoting *Rojas v. INS,* 937 F.2d 186, 190 n.1 (5th Cir. 1991).

Finally, although not relevant in this case because of our determination above, the record does not support the respondent's contentions that the government was unwilling or unable to protect his family. According to the newspaper accounts submitted by the respondent, government officials mounted a massive rescue effort when his brother was kidnapped in 1989, and they succeeded in rescuing his brother. The newspaper accounts indicate that similar efforts were made by police and military officials when his sister was kidnapped in 1991, including roadblocks and police appeals made in the media. Despite the respondent's claims to the contrary, the evidence strongly indicates that his family was afforded extraordinary governmental assistance on behalf of his family. We therefore find that the respondent has also failed to establish a factual basis for this element of his persecution claim.

## IV. CONCLUSION

We conclude that the respondent has failed to demonstrate that the MNLF threatened him or sought to harm him on account of his participation in political demonstrations or on account of his ethnicity or membership in a wealthy family of Chinese ancestry. He therefore has failed to establish eligibility required for asylum or withholding of deportation. *See Matter of Mogharrabi, supra.* Accordingly, the appeal will be dismissed.

**ORDER:**     The respondent's appeal is dismissed.

**FURTHER ORDER:**     Pursuant to the Immigration Judge's order and in accordance with our decision in *Matter of Chouliaris,* 16 I&N Dec. 168 (BIA 1977), the respondent is permitted to depart from the United States voluntarily within 30 days from the date of this order or any extension beyond that time as may be granted by the district director; and in the event of failure to so depart, the respondent shall be deported as provided in the Immigration Judge's order.

*DISSENTING OPINION:* Paul W. Schmidt, Chairman, in which John W. Guendelsberger, Board Member, joined.

I respectfully dissent.

This case involves three primary issues: (1) whether the letter of November 3, 1990, to the respondent from the Moro National Liberation Front ("MNLF") should be considered as evidence supporting the respondent's asylum claim; (2) whether a reasonable person in the respondent's position would have an objective basis for fearing persecution on the basis of race, because of his Chinese ancestry, if returned to the Philippines; and (3) whether the Government of the Philippines is unwilling or unable to protect the respondent from persecution on the basis of race.

I find in the respondent's favor on all three issues. Therefore, I would sustain the appeal and grant asylum.

## I. THE LETTER AS EVIDENCE

The majority accepts as credible that portion of the respondent's testimony regarding his family and their physical encounters with the MNLF, including kidnapping and ransom incidents involving his brother and his sister. However, the majority, in effect, treats the letter of November 3, 1990, corroborating the respondent's claim that the MNLF also sought to target him for harm, even beyond extortion or ransom, as if it were fabricated.

Credibility must be judged on the record as a whole. *See Matter of Kasinga*, 21 I&N Dec. 357 (BIA 1996). The Immigration Judge and the majority have raised some points requiring circumspection in weighing the letter. On the other hand, the letter is consistent with the events described in the respondent's credible testimony. The majority's inference that the letter

is fabricated is not supported by the record. Therefore, while I do not give the letter conclusive weight, it deserves some weight as corroborating the respondent's fear of being targeted for harm by the MNLF.

## II. WELL-FOUNDED FEAR OF PERSECUTION

On the record as a whole, the respondent established by credible evidence that his family was targeted for kidnapping and extortion by the MNLF and that the MNLF may well have some interest in harming him. He also presented evidence from which I conclude that wealthy Filipinos of Chinese ancestry may be at greater risk of being targeted for various extortion and kidnapping-for-ransom schemes than are other wealthy Filipinos. The evidence further supports a finding that certain Filipino government officials may not only condone such targeting of the wealthy Filipino-Chinese, but in some cases may actually be participants in such activities.

Therefore, a reasonable wealthy Filipino-Chinese person whose family had already been targeted for extortion or kidnapping has an objective basis for believing that he is more likely to be targeted for extortion or kidnapping-for-ransom in the future, and less likely to be protected by government authorities, than similarly situated wealthy Filipinos who are not of Chinese ancestry. In turn, it is reasonable to believe that groups such as the MNLF might be more likely to target wealthy Filipino-Chinese persons than to target other wealthy Filipinos.

Extortion or kidnapping, motivated in whole or in part by a ground covered by asylum law, such as race, can constitute persecution. *See Desir v. Ilchert*, 840 F.2d 723 (9th Cir. 1988) (holding that politically motivated extortion or kidnapping can constitute persecution). To constitute persecution on account of race, a racial motivation does not have to be the sole, or even the primary, reason for the persecution. *See Matter of S-P-,* 21 I&N Dec. 486 (BIA 1996) (finding that direct or circumstantial evidence that persecution was motivated in part by a protected ground is sufficient for asylum). The respondent has shown that a reasonable person in his circumstances could have an objective basis (at least a 10 percent chance) to fear persecution on the basis of race. Therefore, the respondent meets the basic standard for a grant of asylum. *INS v. Cardoza-Fonseca*, 480 U.S. 421 (1987); *Matter of Mogharrabi,* 19 I&N Dec. 439 (BIA 1987).

## III. INABILITY OR UNWILLINGNESS TO PROTECT

The remaining issue is whether the respondent's apparently objectively reasonable fear (at least a 10 percent chance) of racially motivated persecution becomes objectively unreasonable because the Philippine Government is both able and willing to protect him. As pointed out by the majority, there is record evidence showing that the Philippine Government made past efforts to protect the respondent and his family. Arguably, therefore, one can infer

that the Philippine Government is both willing and able to protect the respondent from future harm at the hands of the MNLF.

Nevertheless, the record of two kidnappings carried out against the respondent's immediate family suggests some objective basis for doubting the ability of the government to protect the respondent. In addition, the record contains credible evidence of both a general reluctance on the part of the Philippine Government to protect wealthy Filipino-Chinese persons, and a specific inability of the local police to offer the respondent effective protection.

Taking this record as a whole, and particularly considering the evidence of past kidnappings of the respondent's family members by the MNLF, a reasonable person in the respondent's situation has an objective basis (at least a 10 percent chance) to fear racially motivated persecution that the Philippine Government would be unable to prevent. There is also a reasonable basis for the respondent to doubt the willingness of at least some parts of the Philippine Government to protect wealthy Filipinos of Chinese ancestry from the MNLF.

The past successful efforts of the Philippine Government to rescue the respondent's brother and sister, once they had been kidnapped, is insufficient to eliminate the respondent's 10 percent chance of persecution. Therefore, the respondent has a well-founded fear of persecution on account of race at the hands of a group that the Philippine Government is at least unable, if not necessarily entirely unwilling, to control.

This case is distinguishable from *Matter of Tan*, 12 I&N Dec. 564 (BIA 1967). In *Tan*, we found that an ethnic Chinese individual who would be returning to a country which on occasion had experienced mob violence directed against members of his race by individual groups had not met the high standard for withholding of deportation under section 243(h) of the Act, 8 U.S.C. § 1253(h) (1964). *Tan* did not involve the type of specific evidence of racially motivated persecution directed against the respondent's family that is involved in this case. Moreover, *Tan* was not decided under the "well-founded fear" standard for asylum enunciated in *INS v. Cardoza-Fonseca, supra*. I find the current case more analogous to several recent court rulings where government efforts to protect an asylum applicant from racially motivated harm at the hands of private parties were found inadequate to eliminate a well-founded fear. *See Suritan v. INS*, 95 F.3d 814 (9th Cir. 1996); *Singh v. INS*, 94 F.3d 1353 (9th Cir. 1996).

## IV. CONCLUSION

I conclude that (1) the letter from the MNLF submitted by the respondent should be considered as corroboration of his claim of persecution; (2) the respondent has an objectively reasonable fear of racially motivated persecution at the hands of the MNLF if returned to the Philippines; and (3) the objective basis for this fear is not eliminated by past successful efforts by the

Philippine Government to rescue the respondent's family members following kidnappings by the MNLF.

Therefore, I conclude that the respondent has a well-founded fear of persecution on the basis of race if returned to the Philippines. There being no discretionary reasons for denial, I would sustain the respondent's appeal and grant him asylum. I therefore respectfully dissent from the decision to dismiss the respondent's appeal.

*DISSENTING OPINION:* Lory D. Rosenberg, Board Member

I respectfully dissent.

I join in the dissenting opinion of my colleague, Chairman Paul W. Schmidt, in concluding that we should resolve in the respondent's favor the issues regarding his credibility, his contention that his fear of persecution by the Moro National Liberation Front ("MNLF") or their counterpart is on account of a ground protected under section 101(a)(42) of the Immigration and Nationality Act, 8 U.S.C. § 1101(a)(42) (1994), and the evidence that the Government of the Philippines is unwilling or unable to control the MNLF or other Muslim separatists.

## I. DETERMINING THE "NEXUS" IN MIXED MOTIVE CASES

The Moro National Liberation Front is a Muslim organization which seeks autonomy in the Philippines. The organization has a history of racially and politically based persecution directed at the Chinese-Filipino population. The group appears to have a primary base on Mindanao; however, there also is evidence that they are capable of operating throughout the archipelago.

Although the MNLF and the Moro Islamic Liberation Front ("MILF") (a split-off Muslim separatist group apparently by choice not a party to any peace talks) may have a general desire to obtain funds for their cause by kidnapping or coercing payment from wealthy families, the families they are reported to threaten and kidnap are those of Chinese Filipino racial and ethnic background. This is not merely a coincidence, but is directly connected to the fact that these families (1) are not Muslim but Christian, and (2) support the official Philippines Government. The latter appears to be somewhat ironic, as evidence reveals that this government may be complicitous in some of these attacks against Chinese-Filipino families.

The majority concedes that Chinese-Filipinos constitute a social group but contends that even if they do, any persecution they might suffer is not "on account of" their social group status. Contrary to what the majority contends—that the actual targets are wealthy families or businessmen who are seen as a source of money—the official country reports of the Department of State recognize and report consistently that it is wealthy families of *Chinese* racial and ethnic origin which are targeted. Committees on International

Relations and Foreign Relations, 104th Cong., 2d Sess., *Country Reports on Human Rights Practices for 1995* (Joint Comm. Print 1996) [hereinafter 1995 *Country Reports*]; Committees on Foreign Relations and International Relations, 104th Cong., 1st Sess., *Country Reports on Human Rights Practices for 1994* (Joint Comm. Print 1995) [hereinafter 1994 *Country Reports*].[1] These Chinese families, like the respondent's family, appear to vehemently support the government and to oppose the Muslim separatist insurgents. It is reasonable to believe that these insurgents also target these persons to overcome the racial and familial characteristic associated with opposition to their cause. *See, e.g.,* Letter to respondent's father's business.[2]

## A. Consideration of Established Well-Founded Fear Standards

In *Matter of S-P-*, 21 I&N Dec. 486 (BIA 1996), like the United States Court of Appeals for the Ninth Circuit, we made clear our acceptance of a "mixed motive" theory as a basis for establishing that mistreatment by a persecutor was "on account of" a protected ground. Also, like the Ninth Circuit in *Sangha v. INS*, 103 F.3d 1482 (9th Cir. 1997), we recognized that the asylum seeker must establish, by direct or circumstantial evidence, that it is reasonable to believe that the persecutor's action was on account of the victim's opinion. *Matter of S-P-, supra*. The motive for persecution also could be on account of his race, religion, nationality, or social group. *See also Matter of T-M-B-,* 21 I&N Dec. 775 (BIA 1997) (Rosenberg, dissenting), for further discussion of authority in this regard.

The majority apparently is unable or unwilling to understand or apply our decision in *Matter of S-P-, supra*. Nevertheless, that case, as precedent, controls our decisions. *See* 8 C.F.R. § 3.1(g) (1996). There is no statute, regulation, or other authority that requires that a persecutor must seek to harm his victim solely, principally, or probably on account of the offending characteristic. To the contrary, *INS v. Cardoza-Fonseca,* 480 U.S. 421 (1987), recognized that evidence of less than a probability of persecution is sufficient to satisfy the well-founded fear standard. The Supreme Court went on to state that even a 10 percent chance that the victim will be killed, tortured, or otherwise persecuted should be sufficient to satisfy the applicable reasonable fear standard. In other words, even a less than probable chance of persecution

---

[1] In preparing this separate opinion I have reviewed the Department of State *Country Reports* for the year 1994, issued February 1995, and for the year 1995, issued April 1996. Although these are not in the record per se, they are "incorporated herewith by reference" in the Bureau of Democracy, Human Rights and Labor, U.S. Dep't of State, *The Philippines - Profile of Asylum Claims & Country Conditions* (June 1995) [hereinafter *Profile*], which is in the record.

[2] Although I recognize that some questions have been raised by the Immigration Judge and echoed by the majority regarding the letter presented by the respondent as evidence supporting his claim, for reasons discussed herein, I find the letter to have substantial weight.

resulting from a desire to overcome a racial or family-based characteristic will support a finding that an asylum seeker has a well-founded fear.

An asylum applicant does not bear the unreasonable burden of showing the exact motivation of the persecutor when different reasons for actions are possible, so long as a reasonable person would fear that the persecution is on account of one of the five grounds enumerated in the statutory definition of a refugee. *Matter of S-P-, supra*. The courts have recognized that persecutors are not likely to provide their victims with evidence of their motives, and that uncorroborated credible testimony is sufficient to establish a well-founded fear of persecution. *Bolanos-Hernandez v. INS*, 767 F.2d 1277, 1284-88 (9th Cir. 1984).

## B. Persecution on Account of Race or Family Group

The MNLF or Muslim insurgents can and do easily harbor multiple motives towards wealthy ethnic Chinese-Filipinos. *See, e.g., INS v. Elias-Zacarias*, 502 U.S. 478 (1992); *Matter of S-P-, supra; see also Desir v. Ilchert,* 840 F.2d 723, 728 (9th Cir. 1988); *Kovac v. INS*, 407 F.2d 102, 107 (9th Cir. 1969) (holding that deliberate imposition of substantial economic harm can support a claim of political persecution). The likelihood that the MNLF was motived to persecute this family equally or principally on account of its racial, as well as financial, characteristics, which are associated with opposition to the MNLF and support of the government, is supported by the facts in this record.

First, it is worthwhile to note that the protected grounds of persecution are not mutually exclusive. Indeed, in accepting the Board's interpretation of "social group," the Ninth Circuit noted that a reiteration of the individual protected grounds of race, religion, or nationality, which constitute either immutable characteristics or one that it would not be conscionable to expect the victim to eschew, was a reasonable, if not exclusive, basis on which to define a social group. *Sanchez-Trujillo v. INS*, 801 F.2d 1571 (9th Cir. 1986) (accepting Board's reliance on the individual grounds of race, religion, and nationality in defining in part what types of characteristics would constitute a social group); *see also Matter of Kasinga,* 21 I&N Dec. 357 (BIA 1996).

Second, after the unsuccessful kidnapping attempt of the eldest son of the respondent's family, his family gave a public commendation in the newspaper to the military forces who killed four of the persecutors and freed their son. They openly declared their support of the political enemy of the MNLF and MILF. Third, in the kidnapping of the respondent's sister and her family, the Christian beliefs of the family were widely noted as a prayer chain formed seeking their safe return. These actions made clear where the family stood in relation to the government and the insurgents, leaving not only their race and racial ancestry, but their political and religious views exposed. *INS v. Elias-Zacarias, supra; see also Osorio v. INS*, 99 F.3d 928, 1025 (9th Cir.

1996) (stating that the political opinion actually held by or imputed to the victim is essential to determining that persecution, threatened or suffered, is on account of political opinion); *cf. Aruta v. INS*, 80 F.3d 1389, 1392-93 (9th Cir. 1996) (finding that the applicant failed to present any evidence that she expressed a political opinion or that she or her family ever was targeted, threatened, or harmed by rebel groups).

The majority concedes that the respondent's family suffered a pattern of abuse, escalating from mere threatening letters to the actual kidnappings of two of the respondent's siblings, yet erroneously fails to accord these facts any significance. First, the Ninth Circuit has found that "one incident of an arrest of a family member at a church may provide the basis for past persecution of the petitioner's family on account of religion." *Li v. INS*, 92 F.3d 985 (9th Cir. 1996). Second, treatment of family members is a significant factor in determining the reasonableness of the respondent's fear of persecution and his belief that the persecution would be in part on account of his social group and political views. *See, e.g., Hernandez-Ortiz v. INS*, 777 F.2d 509, 515 (9th Cir. 1985) (noting the relevance of a number of threats or acts of violence directed at family members in concluding that the alien's life or freedom is endangered).

Third, the size and prominence of the respondent's family also makes it likely that even if the MNLF is not after him for his earlier political activities, they certainly are likely to attribute to him the progovernment, Christian, public declarations made by his relatives in the newspaper. *See Ramirez Rivas v. INS*, 899 F.2d 864, 865-67 (9th Cir. 1990). Finally, the fact that the respondent's family, which has already suffered the kidnapping and near death of two of the respondent's siblings, has continued to live in the area without further harm, is hardly determinative of the risk of persecution.

Moreover, when there is a fundamentally racial or national division underlying a conflict, most often there is a concomitant "political" dispute. Who would argue that such a dispute is either only "political" or only "racial" or "religious." One look at the Israeli-Palestinian antagonisms tells us otherwise. Here, Muslim separatists, particularly in Mindanao, have sought autonomy in various forms, i.e., the desire of any minority to establish its own territory or to split off from a dominating government in which different racial, national, or an ethnic characteristic predominate. The dominating government is the "enemy" and supporters of that government are either also enemies or prime targets for conversion. *See Gomez-Saballos v. INS*, 79 F.3d 912, 917 (9th Cir. 1996). When the division is along religious (Christian/Muslim) lines, or when certain religious or racial groups line up with the government against separatist insurgents, it stretches the imagination to conclude that the only thing on the insurgents' minds is bleeding a wealthy person or family whom they know is aligned with their arch enemies for their financial resources alone.

## C. Mixed Motives for Harm

In *Singh v. Ilchert*, 69 F.3d 375, 379 n. 1 (9th Cir. 1995), the Ninth Circuit rejected the argument that a Sikh asylum applicant was not tortured on account of political opinion, because the "real motive" was to gather information about Sikh separatists. The court stated that "[w]hile that may have been one motive of the police," an additional motive was that the police refused to believe the applicant when he insisted that he was not a Sikh separatist. *Id.; see also Rodriguez-Roman v. INS*, 98 F.3d 416, 431 (9th Cir. 1996) (holding that the Board erred in concluding that severe punishment an alien would suffer upon return to Cuba following illegal departure would be merely criminal prosecution, rather than persecution on account of political opinion).

The majority acknowledges that an alien may establish eligibility for asylum where the evidence reflects that it is reasonable to believe that the harm suffered was motivated, at least in part, by an actual or imputed protected ground. *See Matter of V-T-S-,* 21 I&N Dec. 792, 796 (BIA 1997) (citing *Matter of S-P-, supra); see also INS v. Elias-Zacarias, supra.*[3] According to the majority, the respondent's and his family's interactions with the MNLF or other Muslim insurgents were wholly devoid of political content or motivation. The majority contends that the threats and abuse inflicted on the respondent's family by members of the group are "consistent with the nonpolitical end of kidnapping for ransom." *Matter of V-T-S-, supra.* The State Department *Country Reports* referenced in the *Profile* indicate to the contrary.

By characterizing the dispute as nonpolitical or invoking another nonprotected motive as "the reason" for the persecution threatened or imposed on the victim, we have too often dismissed valid claims. This has not gone unnoticed by the courts. *See, e.g., Osorio v. INS, supra*, at 1028-29, where the United States Court of Appeals for the Second Circuit affirmed, most dramatically, the petitioner's contention that under the Board's approach, Alexander Solzhenitsyn's dispute with the former Soviet Union would have been aptly characterized, and wrongly dismissed, as literary and not political; *see also Gomez-Saballos v. INS, supra*, at 917 (finding that the Board did not have a substantial basis to characterize threats as mere "individual vengeance"); *supra* note 3.

The 1995 *Country Reports* supports finding a mixed motive in the kidnapping for ransom incidents described here, as it acknowledges that Muslim extremists engage in such "criminal" activity in the name of their ideological

---

[3] While the Board gives lip service to these concepts, in practice, we, as well as many of the Immigration Judges often appear to grasp at any other possibility resulting in the defeat of an asylum claim. The mission of an administrative agency dealing with life and death matters is not to legislate or to second guess the Supreme Court. *See Rodriguez-Roman v. INS*, 98 F.3d 416, 431 (9th Cir. 1996) (noting that, fortunately, judicial review serves the purpose of overseeing and correcting the too often erroneous decisions made in this critical area).

positions. 1995 *Country Reports, supra*, at 700; 1994 *Country Reports, supra*, at 671 (reporting that Muslim extremists "carried out other politically motivated murders.") The Task Force Detainees for the Phillippines ("TFDP"), a nongovernmental organization, apparently concurs, as they contend that while the government persists in characterizing these insurgents as common criminals, in fact, they more likely engage in such activity "in pursuit of their political beliefs." 1995 *Country Reports, supra*, at 701; *see also* 1994 *Country Reports, supra*, at 672.

Furthermore, it approaches the ludicrous to contend that the fact that a persecutor's conduct constitutes a crime, which can be apolitical, thereby divests it of any protected persecutory content. *See* 1995 *County Reports, supra*, at 701 (classifying crimes such as arson, rape, torture, and robbery as human rights violations along with assassinations and massacres). The majority appears to treat the fact that the MNLF's conduct involves kidnapping, which can be a common "crime," to mean it is not harm which would be protected under the Act.

Such a distinguishing proposition is quite doubtful since conduct such as blackmail, espionage, insurrection, kidnapping, murder/assassination, and other acts we would characterize as "terrorism" all constitute crimes, yet have the capacity for political content. *See, e.g., Matter of D-V-*, 21 I&N Dec. 77 (BIA 1993) (finding rape to constitute a form of persecution in Haiti). Interestingly, it appears from the 1994 and 1995 *Country Reports* that, like the majority, the Government of the Philippines engages in a similar sort of refusal to acknowledge the political character of the offenses committed by many of the prisoners it holds. The coincidence of such mutual denial does not, however, render a persecutory motive otherwise.

## II. PROOF BY EVIDENCE WHICH IS PROBATIVE

The ink is hardly dry on our decision in *Matter of S-M-J-*, 21 I&N Dec. 722 (BIA 1997). There we stated that (1) credible testimony was adequate to support a claim for asylum; (2) evidence of country conditions was essential and should be provided by both parties, and that even the Immigration Judge bears a responsibility to see that if he relies on the backdrop of country conditions in assessing the plausibility of the respondents testimony, which he or she should, such evidence must be in the record; and (3) asylum seekers should document easily verifiable circumstances which make up part of their contentions, or provide a reasonable explanation why such documentation is unavailable. *Id*.

Although *Matter of S-M-J-, supra*, was issued long after this case was presented to the Immigration Judge (and in my view, therefore, that precedent should not be applicable to determining the adequacy of the evidence in this case), the majority agrees that the respondent's testimony regarding the actual persecution of his family is credible. Furthermore, such testimony is

supported by newspaper articles corroborating the respondent's credibility. *See Cardoza-Fonseca v. INS*, 767 F.2d 1448, 1453 (9th Cir. 1985) (noting that establishment of objective facts through testimony alone does not make them any less objective), *aff'd*, 480 U.S. 421 (1987). Nevertheless, the majority questions the authenticity of the respondent's documentary evidence, which also corroborates his claim.

Both the Immigration Judge and the majority discounted both the letters the respondent did not provide and the letters the respondent did provide. I do not find their objections to the respondent's testimony about the letters and the photograph not provided, or to the letters which were provided, to support their conclusion that the latter evidence should be given no weight. *Matter of Dass*, 20 I&N Dec. 120 (BIA 1989), did not require the respondent to seek out and submit corroborating evidence of this sort, and although the majority concludes that the persuasiveness of his testimony is weakened by the absence of corroboration, I do not believe that is the standard before the Board or in the Ninth Circuit. *See Bolanos-Hernandez v. INS, supra*.

The respondent had no reason to keep the documents which were not provided. The photograph was taken in 1983 and thrown away some 6 or 7 years before his brother was kidnapped and the respondent fled the country. Unlike the letters he did provide, dated in 1990 and 1994, the respondent had no reason to keep letters he received in the early and mid-80's for a future asylum application he had no reason to know he would be making. *See Kahassai v. INS,* 16 F.3d 323 (9th Cir. 1994).

The letter of November 23, 1994, despite its salutation, not only threatens the respondent's father, but explicitly states that the motivation for the threatened harm was other than merely to obtain funds. The Immigration Judge and the majority apparently reject the letter as suspect because it uses English and Cebuano rather than Tagalog, and because it directly addresses the question of motive. However, as the *Country Reports* reveal, there is an independent reason why the MILF would stress such a point and that is to demonstrate that "[t]his is not an extortion contrary to the favorite expression of our colonial enemy." See 1994 and 1995 *Country Reports, supra*, noting the ongoing internal dispute over the political rather than criminal nature of the separatists' activities. Furthermore, the respondent indicated that his father, to whom the letter was addressed, did not speak Tagalog, but only Chinese and a little English, relying on assistants to translate for him.

Even without the letter of November 23, 1994, there is ample evidence in the record to support the respondent's claim under the appropriate standard. Despite partially conceding his credibility, the majority questions certain aspects of the respondent's claim, relying on its own conclusions, derived principally from the *Profile*, concerning the likelihood of the respondent's claims. In fact, as I have shown, the *Profile*, taken together with the *Country Reports* issued in 1994 and 1995, supports the respondent's claims. *See supra* note 1.

The treatment of the respondent's family bolsters the conclusion that the respondent's fear is well founded. *See Ramos-Vasquez v. INS*, 57 F.3d 857 (9th Cir. 1995) (citing *Ariaga-Barrientos v. INS*, 937 F.2d 411, 414 (9th Cir. 1991) (finding that notwithstanding an utter lack of persecution against the petitioner himself, violence against friends and family that creates a pattern of persecution closely tied to the petitioner may establish a well-founded fear)). In determining eligibility for asylum on the basis of objective facts which raise the possible coexistence of a political and a nonpolitical motive for the persecutor's actions, we are obliged to grant him the benefit of the doubt. *See Matter of S-M-J-, supra*.[4]

## III. UNWILLING OR UNABLE TO RETURN WHEN HOME COUNTRY IS UNWILLING OR UNABLE TO PROTECT

The *Profile* upon which the majority relies indicates that the MNLF is actively operating; that the Muslim separatist forces have been estimated to be about 19,500 strong; that the problem with targeting of Filipino-Chinese individuals is particularly serious on Mindanao. *Profile, supra,* at 4, 5. I also note that the MNLF was able to contact the respondent in Manila to threaten him with harm if he did not curtail his participation in demonstrations seeking government assistance to quell their activities.

In addition, as noted by Chairman Schmidt, the *Profile* contains the suggestion, as do the 1994 and 1995 *Country Reports*, that the government often is complicitous with those who attack Chinese-Filipinos. Furthermore, I am not persuaded that even a good faith effort to rescue victims of persecution (and from reading the news articles submitted it is not clear to me that the efforts were even timely) negates the government's being "unable or unwilling" to control the insurgents. After-the-fact intervention seems a far cry short of "control."

There is no presumption that the absence of affirmative evidence demonstrating that the persecutor operates nationwide means there is no basis for the victim to have a well-founded fear of persecution. *Damaize-Job v. INS*, 787 F.2d 1332, 1336 (9th Cir. 1986); *cf. Matter of R-*, 20 I&N Dec. 621, 627 (BIA 1992) (suggesting that the absence of evidence that there is persecution country-wide means that there is not persecution country-wide). In the event that relocation were even to be considered, the standard to be used is reasonable relocation.[5]

---

[4] See also Office of the United Nations High Commissioner for Refugees, *Handbook on Procedures and Criteria for Determining Refugee Status Under the 1951 Convention and The 1967 Protocol Relating to the Status of Refugee*s paras. 203-204, at 48 (Geneva, 1992). In addition, where an applicant is unable to provide documentary or other support for all of his or her statements, yet provides a credible account, he or she should be given the benefit of the doubt. *Id*. para. 196, at 47.

[5] I note in passing that the suggestion in the *Profile* that internal resettlement is the "most expedient solution" is inappropriate. The determination of whether relocation is reasonable is

## IV.  CONCLUSION

Based upon the respondent's credible testimony, his documentation, and the *Country Reports*, I believe it is reasonable to conclude that the insurgents' actions were motivated, at least in part, by the respondent's racial ancestry, his expressed political opposition (to a racial conflict), and his family's declared support of the government and of the Christian religion.

---

one for the adjudicator, and by my reading of the law, is not a determination for the Department of State to make.  Furthermore, expedience is not the standard; reasonableness is the standard. See discussion in *Matter of C-A-L-*, 21 I&N Dec. 754 (BIA 1997) (Rosenberg, dissenting); *Matter of T-M-B-, supra*, (Rosenberg, dissenting).