[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JAN 8, 2007
THOMAS K. KAHN
CLERK

_____

No. 06-12708
Non-Argument Calendar

_____

Agency No. A97-201-911

VYACHESLAV NIFTALIEV,
LYUDMILA NIFTALIEVA,
DMITRO NIFTALIEV,

Petitioners,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals

_____

**(January 8, 2007)**

Before TJOFLAT, HULL and KRAVITCH, Circuit Judges.

PER CURIAM:

Vyacheslav Niftaliev, on behalf of his wife, Lyudmila, and his son, Dmitro,

petitions this court for review of the final order of the Board of Immigration Appeals (BIA). The BIA's order affirmed the Immigration Judge's (IJ) denial of his application for withholding of removal under the Immigration and Nationality Act (INA). Because the IJ's decision is supported by substantial evidence, we deny Niftaliev's petition.

## I. Background

Niftaliev and his family are citizens of Ukraine and entered the United States in February 2001 on non-immigrant visas. They overstayed their visas, and the INS[1] issued notices to appear, charging them with removability under INA § 237(a)(1)(B), 8 U.S.C. § 1227(a)(1)(B).

After conceding his eligibility for removal, Niftaliev sought asylum and requested withholding of removal. The IJ found Niftaliev's application for asylum untimely and heard testimony on the question of withholding of removal under both INA § 241(b)(3) and the Convention against Torture (CAT).[2]

In his application for asylum and in testimony at the hearing, Niftaliev

---

[1] On November 25, 2002, President Bush signed into law the Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135. The act created a new Department of Homeland Security, abolished the INS, and transferred its functions to the new department. Because this case began before the transfer, this opinion refers to the INS.

[2] The BIA affirmed the IJ's determination that Niftaliev's application for asylum was untimely, and Niftaliev does not appeal that decision nor does he appeal the decision he was ineligible for relief under CAT.

alleged that he had suffered from discrimination and harassment because of his mixed ancestry (his mother was Ukranian and his father was Azerbaijani) from childhood until he left Ukraine in 1996. As a child, teachers and classmates belittled his mixed ethnicity. During his military service, Niftaliev stated that he and other ethnic minorities were subject to harassment and mistreatment by superiors and peers including beatings, ethnic slurs, and menial assignments. After his military service, Niftaliev moved to Estonia to attend Tallin Polytechnical Institute where, according to his testimony, he was also subject to mistreatment from students and faculty because of his ethnicity. Niftaliev was eventually expelled from the Institute because of his protests against his mistreatment.

Niftaliev returned to Ukraine in 1987 and had difficulty in securing employment because of his mixed ethnicity. After the dissolution of the Soviet Union, Niftaliev's difficulties increased because he does not speak or write Ukranian well. He did, however, receive a correspondence degree from the Polytechnic Institute in Kiev and was able to find some temporary jobs.

In response to this constant discrimination, Niftaliev and three other individuals formed an unofficial political group to protest and boycott the 1994 elections because neither of the candidates supported minority rights. Niftaliev testified that the group organized rallies and printed and distributed pamphlets, posters, and newspapers. Niftaliev described in his asylum declaration that

3

members of a nationalist party, the Ukranian National Assembly-Ukranian National Self-Defense Organization (UNA-UNSO) beat him for his protests in early 1995, but his complaints to the police went unheeded.

In early 1995, Lavrenty Malazoniya, a member of the protest group and television reporter, hired Niftaliev to be his assistant. Together, they reported on "government corruption and racist attitudes." That June, Niftaliev was summoned to the Security Services of Ukraine (SBU) where he was interrogated by Major Igor Konovalov about his activities with Malazoniya. Although the Major was friendly at first, when Niftaliev refused to cooperate, he was beaten and threatened not to "undermine his country." At the hearing, Niftaliev testified that the detention lasted between two and four hours.

Despite the threats, Niftaliev participated in a protest in July 2005 that was broken up by police. Niftaliev was detained briefly by the police and they took his name. The next month, SBU agents, including Major Konovalov, searched Niftaliev's house and took him into custody where he was beaten and called an "Azeri dog" even though he told them information to avoid being hurt. The detention also lasted between two and four hours.

In October 1995,Vadim Kofman, another member of the protest group, was beaten by the UNA-UNSO and, again, the police did nothing. The group planned a rally to protest the police's inaction, but on the day of the rally, the police raided

4

Niftaliev's home and found picket signs and other protest material. The police beat him and demolished much of his apartment.

Niftaliev and his group filed complaints with the police and the Attorney General but heard nothing. In December, the group decided to attempt to speak to the Attorney General directly but were apprehended by the SBU at the Attorney General's office.

Niftaliev testified that he was held by the SBU for fifteen days during which he was placed in solitary confinement, beaten, given little or no food, and threatened. On his final day of detention, Major Konovalov held a pistol to his head and said he was sick of seeing his "ugly Azeri face." Niftaliev pleaded for his life and promised to leave the country if he was allowed to live.

After spending two months in the hospital recovering from injuries suffered in detention, Niftaliev and his family emigrated from Ukraine to Argentina. They lived there for almost five years before entering the United States. Although Niftaliev gained permanent residency in Argentina, he left the country for the United States after claiming to have been approached by an SBU agent seeking information about the chemical plant where Niftaliev worked. Niftaliev initially refused to help, but the agent informed Niftaliev that his parents, who still lived in Ukraine, would be harmed if Niftaliev did not cooperate. He then agreed to help but instead went into hiding in Argentina and subsequently entered the United

5

States. His parents do not appear to have been harmed.

Although Niftaliev provided extensive documentation regarding the general status of human rights in Ukraine and the plight of ethnic minorities in particular, he did not offer any corroborating evidence regarding any of his political activities or instances of detention and physical abuse.

In his oral decision, the IJ denied Niftaliev's application despite acknowledging the consistency of Niftaliev's testimony with his written declaration and the fact that the cross-examination "did not reveal anything material or pertinent enough that would lead me to conclude that [Niftaliev] would have been [sic] an incredible witness." The IJ also noted that the State Department's Country Reports broadly supported the claims of police abuse against ethnic minorities but the IJ was careful to state that the abuses in the Reports did not necessarily amount to persecution.

The IJ concluded, however, that Niftaliev did not meet his burden of proof to establish eligibility for withholding of removal because the lack of detail in his testimony and lack of documentary corroboration. The IJ also concluded that Niftaliev had not been tortured even assuming that he had been denied food for fifteen days while in detention and that it was not more likely than not that Niftaliev would be subject to persecution should he return to Ukraine.

The BIA dismissed Niftaliev's appeal in a two paragraph order. The BIA

found no "reversible error" regarding the IJ's finding that the asylum application was untimely and found no "clear error" in the IJ's determination that Niftaliev failed to meet his burden of proving that it was more likely than not that he would suffer persecution in Ukraine. The BIA noted that persecution under the INA "does not encompass all treatment that society regards as unfair, unjust, or even unlawful or unconstitutional." (Quoting Matter of V-T-S, 21 I&N Dec. 792 (BIA 1997)).

## II. Standard of Review

Although the BIA did not expressly adopt the IJ's opinion, the BIA did affirm the IJ's decision without analysis and so we review both the BIA's order and the IJ's determination. See Al Najjar v. Ashcroft, 257 F.3d 1262, 1284 (11th Cir. 2001) ("Insofar as the Board adopts the IJ's reasoning, we will review the IJ's decision as well."). We review the BIA's legal conclusions de novo. D-Muhumed v. U.S. Att'y Gen., 388 F.3d 814. 817 (11th Cir. 2004). We do not review the factual record anew; rather, we are obligated to review factual determinations under the deferential substantial evidence test and will affirm its decision "if it is supported by reasonable, substantial, and probative evidence on the record considered as a whole." Id. at 817-18 (11th Cir. 2004) (quoting Al Najjar, 257 F.3d at 1283-84) (quotations omitted). "Under the substantial evidence test, we

7

view the record evidence in the light most favorable to the agency's decision and draw all reasonable inferences in favor of that decision." Adefemi v. Ashcroft, 386 F.3d 1022, 1027 (11th Cir. 2004). "To reverse the IJ's fact findings, we must find that the record not only supports reversal, but compels it." Mendoza v. U.S. Att'y Gen., 327 F.3d 1283, 1287 (11th Cir. 2003).

III.

The issue in this case is whether the evidence compels the conclusion that BIA erred in upholding the IJ's determination that Niftaliev did not meet his statutory burden under INA § 241(b)(3); 8 U.S.C. § 1231(b)(3). To be entitled to withholding of removal, an alien "must show that his life or freedom would be threatened on account of race, religion, nationality, membership in a particular social group, or political opinion." Sanchez v. U.S. Att'y Gen., 392 F.3d 434, 437 (11th Cir. 2004). "An alien bears the burden of demonstrating that he more-likely-than-not would be persecuted or tortured upon his return to the country in question." Id.

An applicant for withholding of removal may satisfy his burden in either of two ways. Tan v. U.S. Att'y Gen., 446 F.3d 1369, 1375 (11th Cir. 2006). First, an alien may establish "past persecution . . . based on a protected ground." Id. (citing Mendoza v. U.S. Att'y Gen., 327 F.3d 1283, 1287 (11th Cir. 2003)). If an alien establishes "past persecution," a rebuttable presumption arises that he has a

8

"well-founded fear of future persecution," and the burden shifts to the DHS to show that the conditions of the country have changed or the alien could avoid a future threat through relocation. Id.

Second, an alien is entitled to withholding of removal if he establishes "that is it more likely than not that [he] would be persecuted on account of race, religion, nationality, membership in a particular social group, or political opinion upon removal to that country." 8 C.F.R. § 208.16(b)(2). "An alien cannot demonstrate that [he] more-likely-than-not would be persecuted on a protected ground if the [IJ] finds that the alien could avoid a future threat by relocating to another part of [his] country." Tan, 446 F.3d at 1375. The well-founded fear inquiry contains both an objective and subjective component; the petitioner must be genuinely afraid and that fear must be objectively reasonable. Al Najjar, 257 F.3d at 1289. Furthermore, it is the petitioner's burden to present "specific, detailed facts showing a good reason to fear that [he] will be singled out for persecution." Id. at 1287 (internal quotation, emphasis, and citation omitted).

Although the INA does not expressly define "persecution," see INA § 101(a)(42), 8 U.S.C. § 1101(a)(42), this court has held that persecution is "an extreme concept, requiring more than a few isolated instances of verbal harassment or intimidation[.]" Sepulveda v. U.S. Att'y Gen., 401 F.3d 1226, 1231 (11th Cir. 2005).

9

The BIA has defined persecution to mean "a threat to the life or freedom of, or the infliction of suffering or harm upon, those who differ in a way regarded as offensive." Matter of Acosta, 19 I&N Dec. 211, 222 (BIA 1985). However, the BIA also has stated that "persecution [does] not encompass all treatment that society regards as unfair, unjust, or even unlawful or unconstitutional." In re V-T-S, 21 I&N Dec. 792, 798 (BIA 1997).

A petitioner's credible testimony can be sufficient to meet his burden of proof without corroboration. 8 C.F.R. §§ 208.16(b); Tan, 446 F.3d at 1376. Although the IJ found Niftaliev's testimony to be consistent with his application and declaration, he held that Niftaliev's testimony was insufficiently detailed to meet his burden of proof. The IJ does not explicitly discount Niftaliev's credibility, but he repeatedly refers to the lack of any supporting evidence regarding the existence of Niftaliev's small political group, the detentions, or any medical treatment received after the alleged mistreatment. The IJ's emphasis on the absence of documentation supporting Niftaliev's testimony suggests that the IJ did not fully credit Niftaliev's testimony. But an explicit credibility determination was not made.

Our review of the factual record is significantly hampered when the IJ does not make a credibility determination. See Yang v. U.S. Att'y Gen., 418 F.3d 1198, 1201 (11th Cir. 2005). Because, as in Yang, the IJ's analysis focused on the

insufficiency of the evidence, we will assume that any implicit credibility decision was not dispositive to the outcome of the case.  Id.

Our standard of review governs our reading of the record in this case.  Silva v. U.S. Att'y Gen., 448 F.3d 1229, 1237 (11th Cir. 2006).  We do not substitute our analysis of the evidence for the IJ's but instead look to see if the IJ's decision was reasonable and based on substantial evidence.  Id.

The standard governing what constitutes past persecution is high.  This court has held that detentions based on a protected ground do not necessarily rise to the level of persecution.  See Zheng v. U.S. Att'y Gen., 451 F.3d 1287 (11th Cir. 2006) ("Although under certain circumstances detention may rise to the level of persecution, Zheng's five-day detention during which he was not harmed does not *compel* the conclusion that he experienced past persecution." (emphasis in the original)).[3]

Other circuits also have  held that cases involving detentions do not compel a contrary finding of persecution.  See Dandan v. Ashcroft, 339 F.3d 567 (7th Cir. 2003) (three-day detention where suspect was denied food and was given a

_____

[3] Two unpublished opinions of this court, although not binding precedent, are persuasive here.  In Gebremarian v. U.S. Att'y Gen., this court held that a fourteen-day detention "suffered under hostile conditions" did not rise to the level of persecution.  126 Fed. Appx. 934, 936 (11th Cir. 2005) (unpublished).  And in Arbeleaz v. U.S. Att'y Gen., this court held that being threatened, beaten, and actually shot in the leg, while serious, did not constitute persecution.  181 Fed. Appx. 926 (11th Cir. 2006) (unpublished).

"swollen" face did not compel a finding of persecution); <u>Fesseha v. Ashcroft</u>, 333 F.3d 13 (1st Cir. 2003) (holding that several twenty-four hour detentions were not sufficient to count as persecution); <u>Nelson v. INS</u>, 232 F.3d 258 (1st Cir. 2000) (describing multiple cases across the circuits where detentions with beatings were not found to be past persecution).

Under our case law, only Niftaliev's last detention even approaches the level of mistreatment that can fairly be characterized as past persecution. The other incidents, while unfortunate, are best characterized as mere harassment. <u>See</u> <u>Sepulveda</u>, 401 F.3d at 1231. And although Niftaliev certainly suffered during the fifteen-day detention, the facts do not *compel* a conclusion of past persecution.

IV. Conclusion

The record in this case does not compel a finding of past persecution given the deferential standard of review and the standard of proof necessary to show past persecution. Accordingly, we **DENY** Niftaliev's petition.