# In re A-S-, Respondent

*Decided February 19, 1998*

U.S. Department of Justice
Executive Office for Immigration Review
Board of Immigration Appeals

(1) Although the Board of Immigration Appeals has de novo review authority, the Board accords deference to an Immigration Judge's findings concerning credibility and credibility-related issues.

(2) The Board of Immigration Appeals defers to an adverse credibility finding based upon inconsistencies and omissions regarding events central to an alien's asylum claim where a review of the record reveals that (1) the discrepancies and omissions described by the Immigration Judge are actually present; (2) these discrepancies and omissions provide specific and cogent reasons to conclude that the alien provided incredible testimony; and (3) a convincing explanation for the discrepancies and omissions has not been supplied by the alien.

(3) Since an Immigration Judge is in the unique position to observe the testimony of an alien, a credibility finding which is supported by a reasonable adverse inference drawn from an alien's demeanor generally should be accorded a high degree of deference, especially where such inference is supported by specific and cogent reasons for doubting the veracity of the substance of the alien's testimony.

FOR RESPONDENT: Robert A. Murtha, Jr., Esquire, Washington, D.C.

BEFORE: Board En Banc: DUNNE, Vice Chairman, VACCA, HEILMAN, HOLMES, HURWITZ, VILLAGELIU, FILPPU, COLE, MATHON, and JONES, Board Members. Dissenting Opinions: SCHMIDT, Chairman, joined by GUENDELSBERGER, Board Member; ROSENBERG, Board Member.

HURWITZ, Board Member:

In a decision dated September 3, 1996, an Immigration Judge found the respondent deportable as charged and denied his applications for asylum under section 208(a) of the Immigration and Nationality Act, 8 U.S.C. § 1158(a)(1994), and withholding of deportation under section 243(h) of the Act, 8 U.S.C. § 1253(h) (1994). In lieu of deportation, the Immigration Judge granted the respondent the privilege of voluntary departure under section 244(e)(1) of the Act, 8 U.S.C. § 1254(e)(1) (1994). The respondent has timely appealed the Immigration Judge's decision denying the applications for asylum and withholding of deportation. For the following reasons, we will dismiss the respondent's appeal.

## I.  FACTUAL BACKGROUND

The respondent is a 29-year-old native and citizen of Bangladesh who claims that he suffered past persecution and has a well-founded fear of persecution in his native country on account of his political opinion. The respondent entered the United States on September 2, 1994, without valid documentation and shortly thereafter filed an Application for Asylum and for Withholding of Deportation (Form I-589). After the initiation of these proceedings, the respondent submitted a second asylum application.[1]

The respondent testified at his deportation hearing that in 1985 he joined the Jatiyo Party, the political party of then-President Mohammed Ershad. He claimed that in 1987, the Jatiyo Party appointed him to the position of "Organizing Secretary" for his sub-district, a job that involved numerous duties, including meetings with President Ershad twice a month. The respondent testified that in 1991, after President Ershad was defeated in general elections, members of the Bangladesh National Party ("BNP") and Awami League, two rival political parties, began to search for him. Members of these political parties allegedly planned to recruit the respondent or to kill him in retaliation for his role in the Jatiyo Party.

The respondent then described the various incidents that form the heart of his persecution claim. First, the respondent testified that on July 12, 1993, BNP members forcibly entered his house in an effort to find him. Although the respondent was not home at the time, the intruders threatened his parents. In contrast, the respondent's asylum application states that this incident occurred on March 12, 1991. Also differing from the oral testimony, the asylum application states the respondent was at home at the time of the intrusion but that he hid from the BNP members.

Second, the respondent testified that later that same month (July 1993), BNP and Awami League members returned to his house, and as he attempted to flee, they severely beat him about the head with a bamboo stick. The respondent claimed that he was rendered unconscious from the beating and required 3 weeks of medical treatment. In contrast, the respondent's asylum application states that this incident occurred on January 10, 1992.

Next, the respondent described a third incident which occurred sometime that same month (July 1993). This incident involved members of the BNP and Awami League forcibly entering his house at approximately 11:00 p.m. When these political opponents allegedly discovered that the respondent was not at home, they physically assaulted members of his family.[2]  This incident is nowhere described in his asylum application. The asylum application does,

---

[1] Pursuant to 8 C.F.R. § 208.3(b) (1997), "[a]n application for asylum shall be deemed to constitute at the same time an application for withholding of deportation."

[2] Although this incident closely resembles the first incident described by the respondent, the direct examination of the respondent elicited a description of three separate incidents which allegedly occurred in July 1993.

however, recount that the respondent was involved in a July 1993 demonstration at which police physically attacked him, necessitating several days of medical treatment. The respondent did not offer any testimony about this incident at his deportation hearing.

Finally, the respondent testified that police issued a warrant for his arrest on July 15, 1994, which falsely alleged that he had committed various political crimes. In contrast, his asylum application states that police issued this warrant on January 15, 1994.

Because he feared arrest and believed that he would endure further persecution, the respondent secured a false passport and fled Bangladesh. The respondent fears returning to Bangladesh because he believes that his political opponents will kill him. Members of the BNP and Awami League allegedly have told the respondent's father that they are looking for the respondent and plan to kill him.

## II. THE IMMIGRATION JUDGE'S DECISION

Citing *Matter of Mogharrabi*, 19 I&N Dec. 439 (BIA 1987), the Immigration Judge found that the respondent's testimony could not "be relied upon," and "was vague and lacking in specifics and details," especially considering the respondent's alleged high-level participation in the Jatiyo Party. In his decision, the Immigration Judge (1) provided numerous examples of the respondent's inconsistent testimony involving dates that conflicted with the asylum application; (2) pointed out that the respondent failed to offer any testimony regarding his participation in the July 1993 demonstration; (3) stated that the respondent "seemed to have some confusion about the February of 1991 elections," and gave contradictory testimony about whether the Jatiyo Party and President Ershad actually took part in the elections or won any seats; and (4) refused to give significant weight to two letters submitted by the respondent to prove his party membership. In offering further support for his adverse credibility finding, the Immigration Judge also observed that the respondent testified in a "very halting" and "hesitant" manner.

After noting these concerns, the Immigration Judge concluded that the sparse documentary evidence of record failed to support the respondent's allegations of persecution. Finally, he found that the respondent's fear of persecution was not well founded considering the recent participation of the Jatiyo Party with the coalition government, and he therefore denied the applications for asylum and withholding of deportation. As noted above, the Immigration Judge granted the respondent the privilege of voluntary departure from the United States.

## III. ANALYSIS

The respondent alleges on appeal that the Immigration Judge "acted in an arbitrary and capricious manner by discounting [his] detailed oral testimony."

Without addressing any of the concerns raised by the Immigration Judge regarding his lack of credibility, the respondent states in a conclusory fashion that "his testimony is believable and sufficiently detailed to meet the standard articulated in the [Board's] decision [in] *Matter of Mogharrabi*."

It is axiomatic that the Board has the authority to employ a de novo standard of appellate review in deciding the ultimate disposition of a case. *Matter of Burbano,* 20 I&N Dec. 872, 873 (BIA 1994) (citing 8 C.F.R. § 3.1(d)(1) (1994)). However, it is also well established that because the Immigration Judge has the advantage of observing the alien as the alien testifies, the Board accords deference to the Immigration Judge's findings concerning credibility and credibility-related issues. *See Matter of Burbano, supra*, at 874; *Matter of Pula*, 19 I&N Dec. 467, 471-72 (BIA 1987); *Matter of Kulle,* 19 I&N Dec. 318, 331-32 (BIA 1985), *aff'd*, 825 F.2d 1188 (7th Cir. 1987), *cert. denied,* 484 U.S. 1041 (1988). Under certain circumstances, the Board may not accord deference to an Immigration Judge's credibility finding where that finding is not supported by the record. *See, e.g., Matter of B-*, 21 I&N Dec. 66, 70 (BIA 1995); *Matter of B-*, 7 I&N Dec. 1, 32 (BIA 1955; A.G. 1956).

In this case, the Immigration Judge's decision comprehensively enumerates the reasons underpinning the adverse credibility determination. The Immigration Judge focused not only on the inconsistencies and omissions regarding the dates of key events forming the heart of the respondent's persecution claim, but he also relied on observations of the respondent's demeanor. Because our review of the record reveals that the Immigration Judge's findings are supported by specific and cogent reasons, and that reasonable inferences and conclusions were drawn by him with regard to credibility, we will not substitute our judgment for that of the Immigration Judge.

## A. Inconsistencies and Omissions

The Immigration Judge focused much of the adverse credibility finding on the inconsistencies and omissions regarding dates and events central to the respondent's persecution claim. *See de Leon-Barrios v. INS*, 116 F.3d 391, 393-94 (9th Cir. 1997) (holding that the Board correctly determined that the Immigration Judge's adverse credibility finding was supported by discrepancies involving the heart of the applicant's claim). As relates to this analysis, our review of the record reveals that (1) the discrepancies and omissions described by the Immigration Judge are actually present; (2) these discrepancies and omissions provide specific and cogent reasons to conclude that the respondent provided incredible testimony; and (3) the respondent has not provided a convincing explanation for the discrepancies and omissions. As stated above, under these circumstances, we find no reason to disturb the Immigration Judge's adverse credibility determination.

First, the record supports the Immigration Judge's finding that the respondent did, in fact, provide dates inconsistent with his asylum application and

also omitted seemingly important events on his asylum application and while testifying. The respondent testified about three separate events (involving the BNP and/or Awami League entering his house), even though his asylum application described only two such events. The respondent also testified that the first event occurred on July 12, 1993, while his application states that this event occurred on March 12, 1991. Additionally, the respondent testified that the event involving the beating with a bamboo stick occurred in July 1993, while his application states that this event occurred on January 10, 1992. Moreover, the respondent testified that police lodged criminal charges against him on July 15, 1994, while his application states that this event occurred on January 15, 1994. In addition to these discrepancies, the respondent did not testify concerning the July 1993 demonstration, in which he allegedly was attacked physically by members of the BNP and national police, necessitating several days of medical treatment; nor did his asylum application reference the third encounter involving the BNP and Awami League members entering his house in July 1993.

Second, we conclude that the Immigration Judge relied on specific and cogent reasons concerning the above-described inconsistencies and omissions. *See Aguilera-Cota v. INS*, 914 F.2d 1375, 1381 (9th Cir. 1990) (holding that any inferences drawn concerning the implausibility of factual allegations must be supported by substantial evidence). We recognize that in some cases, an applicant who has fled persecution may have trouble remembering exact dates when testifying before an Immigration Judge. For example, the Board has found that under certain circumstances, the failure to provide precise dates may not be an indication of deception. *See Matter of B-*, 21 I&N Dec. 66, 70. However, in this case, the dates provided by the respondent during his testimony were inconsistent with those in his asylum application by more than 2 years—a significant period of time considering that the respondent fled Bangladesh only 1 year after the alleged incidents. Aside from the discrepant dates provided, and perhaps even more significant, is the fact that the respondent conflated into 1 month (July 1993) the three events allegedly involving forced entries into his house by BNP and/or Awami League members. Furthermore, while omissions of facts in an asylum application or during testimony might not, in themselves, support an adverse credibility determination, in this case the omission of key events is coupled with numerous inconsistencies, and it is therefore another specific and cogent reason supporting the Immigration Judge's adverse credibility finding.

Third, the respondent's appellate brief fails specifically to address the Immigration Judge's adverse credibility determination. Therefore, the record still lacks a convincing explanation for the inconsistencies or omissions addressed in the Immigration Judge's decision. *Cf. Matter of B-*, 21 I&N Dec. 66 (accepting the applicant's convincing reasons to reject the Immigration Judge's adverse credibility determination).

## B. Demeanor

We observe that the above-described inconsistencies and omissions alone would be sufficient to support the Immigration Judge's adverse credibility determination. However, in addition, the Immigration Judge made observations regarding the respondent's demeanor, specifically stating that the respondent testified in a "very halting" and "hesitant" manner. *See Kokkinis v. District Director*, 429 F.2d 938, 941-42 (2d Cir. 1970) (holding that "great weight" should be afforded to the findings of the special inquiry officer who conducted the deportation hearing because he had the opportunity to observe the respondent's demeanor and cited persuasive reasons for his adverse credibility finding). Again, we emphasize that the Immigration Judge is in the unique position of witnessing the live testimony of the alien at the hearing. *See Matter of V-T-S-*, 21 I&N Dec. 792, 796 (BIA 1997) (recognizing the Immigration Judge's "advantage of observing the alien as he testifies"); *see also Sarvia-Quintanilla v. INS*, 767 F.2d 1387, 1395 (9th Cir. 1985) (holding that an Immigration Judge is in the unique position to observe the alien's tone and demeanor, to explore inconsistencies in the testimony, and to determine whether the testimony has "the ring of truth"). Because an appellate body may not as easily review a demeanor finding from a paper record, a credibility finding which is supported by an adverse inference drawn from an alien's demeanor generally should be accorded a high degree of deference. *See, e.g., Cordero-Trejo v. INS*, 40 F.3d 482, 487 (1st Cir. 1994) (holding that credibility findings based on demeanor findings deserve more deference than those based on testimonial analysis); *Paredes-Urrestarazu v. INS*, 36 F.3d 801, 818-21 (9th Cir. 1994) (holding that credibility findings based on demeanor findings deserve "special deference" when compared with those based on testimonial analysis; and holding that the adverse credibility finding in this case drew on legitimate inferences based on the alien's demeanor coupled with an accurate assessment of the record).

This is not to say that demeanor findings are subject to no scrutiny or criticism by the Board. Under certain circumstances, for example, the Board has found insufficient evidence to indicate that the respondent's tendency to look at the wall or table, instead of at the Immigration Judge, necessarily indicates deception. *Matter of B-*, 21 I&N Dec. 66, 70; s*ee also Paredes- Urrestarazu v. INS, supra*, at 818 (stating that nervousness is a factor properly considered in assessing an alien's credibility). In this case, however, the Immigration Judge's reasonable determination that the respondent's very halting and hesitant manner of testifying indicated deception is bolstered by the Immigration Judge's full range of specific and cogent credibility findings. For example, the Immigration Judge specifically commented that the respondent's testimony was "all too often . . . vague and lacking in specifics and details." Therefore, the facts of the instant case stand in sharp contrast to those in *Matter of B-*, *supra*, at 70, where the Board was "impressed with the indications

of the applicant's truthfulness," and found that the testimony was "entirely consistent with the applicant's detailed" asylum application. The instant case is not one in which the alien delivered halting and hesitant testimony which was nonetheless detailed and consistent in its factual content. Rather, the respondent's testimony is marked by inconsistencies and omissions, and the Immigration Judge's findings regarding the substance of the respondent's testimony provide additional support for the reasonable conclusion that the respondent's testimonial demeanor called his credibility into doubt. *See Matter of Burbano, supra*, at 874 ("[W]e also may give significant consideration to other findings of an immigration judge that are based upon his or her observance of witnesses when the basis for those findings are [sic] articulated in the immigration judge's decision."); *Matter of Teng*, 15 I&N Dec. 516, 518 (BIA 1975) (adopting the Immigration Judge's adverse credibility finding based on demeanor and inconsistencies).

## IV.   CONCLUSION

As the Board has held, a credibility determination "apprehends the overall evaluation of testimony in light of its rationality or internal consistency and the manner in which it hangs together with other evidence." *Matter of Lugo-Guadiana*, 12 I&N Dec. 726, 729 (BIA 1968). Examined under this standard, coupled with observations of demeanor, and given the deference it deserves, the Immigration Judge's adverse credibility determination finds ample support in the record. Because we adopt the Immigration Judge's well-supported determination that the respondent's testimony cannot be accepted as credible, it follows that the respondent has failed to satisfy his burdens of proof and persuasion. *See Matter of V-T-S-, supra*, at 795 ("[A]n applicant for asylum bears the evidentiary burdens of proof and persuasion in any application for asylum . . . ."); 62 Fed. Reg. 10,312, 10,342 (1997) (to be codified at 8 C.F.R. § 208.13(a) (interim, effective Apr. 1, 1997).

Because the respondent has not established statutory eligibility for asylum, we need not address the issue of whether he warrants a favorable exercise of discretion. *See generally Osorio v. INS*, 18 F.3d 1017, 1021 (2d Cir. 1994); *Matter of H-*, 21 I&N Dec. 337 (BIA 1996); *Matter of Pula, supra* (discussing factors to analyze in exercising discretion).

Inasmuch as the respondent has failed to satisfy the lower burden of proof required for asylum, it follows that he also has failed to satisfy the clear probability standard of eligibility required for withholding of deportation. *See Matter of Mogharrabi, supra*. The evidence does not establish that it is more likely than not that the respondent would be subject to persecution on account of one of the five grounds specified in section 243(h) of the Act. *See INS v. Cardoza-Fonseca*, 480 U.S. 421 (1987); *INS v. Stevic*, 467 U.S. 407 (1984).

In light of the foregoing, we will enter the following orders.

**ORDER:**      The respondent's appeal is dismissed.

**FURTHER ORDER:**     Pursuant to the Immigration Judge's order and in accordance with our decision in *Matter of Chouliaris*, 16 I&N Dec. 168 (BIA 1977), the respondent is permitted to depart from the United States voluntarily within 30 days from the date of this order or any extension beyond that time as may be granted by the district director; and in the event of failure so to depart, the respondent shall be deported as provided in the Immigration Judge's order.

*DISSENTING OPINION*: Paul W. Schmidt, Chairman, in which John W. Guendelsberger, Board Member, joined

I respectfully dissent.

I disagree with the enhanced standard of deference to the Immigration Judge set forth in the majority opinion. That standard, while well-intentioned, unduly restricts the de novo review authority of Board Members and, in this particular case, produces an erroneous denial of asylum.

We have de novo authority to make fact findings upon appeal. *Matter of B-*, 7 I&N Dec. 1 (BIA 1955; A.G. 1956). As Board Members, we are authorized to exercise independent judgment in deciding cases within our jurisdiction. 8 C.F.R. § 3.1(a)(1) (1997). Upon such de novo review, and exercising my independent judgment, I find that the respondent testified in a credible manner.

Accepting the truth of the respondent's testimony, I conclude that he has established past persecution and a well-founded fear of future persecution in his native country of Bangladesh. Finding no discretionary reason to deny asylum, I would sustain his appeal and grant him asylum.

## I.  DE NOVO REVIEW IS DIMINISHED

In my view, the majority basically concludes that if the Immigration Judge's credibility finding is within a zone that could be reached by a reasonable adjudicator, cites problems that actually are reflected in the record, and is not convincingly challenged on appeal, it *must* be upheld upon appellate review.

I recognize and appreciate the thought and effort that went into developing and articulating this standard. It is a substantial improvement over the conclusory references to "deference" contained in our prior precedents, and it provides a plausible intellectual framework for future adjudications. I also realize that application of this standard may well promote a more uniform approach to deference among our various panels and that it is desirable that the public have meaningful guidance as to the standard under which we conduct our appellate review of credibility determinations. I have three problems with the majority's approach to deference.

## A. We Are an Expert Tribunal

First, the majority's standard is more appropriate to an appellate court of general jurisdiction than it is to a specialized, expert administrative appellate body such as our Board. This is of particular concern in the important area of asylum adjudication. Asylum applicants are entitled to a practical, deferential adjudication that recognizes both the frailties of the human mind and the chaotic, traumatic situations in which asylum claims arise. *See, e.g., Matter of Mogharrabi,* 19 I&N Dec. 439 (BIA 1987).

In many cases, the expertise, independence, and sound judgment of this Board is all that stands between an asylum applicant and return to a place where he or she will face persecution or death. It is quite possible that we review more asylum adjudications than any other tribunal in the world. Certainly, each Board Member adjudicates many more asylum cases, from a wider variety of nationalities, than any individual Immigration Judge. We also have nationwide jurisdiction and a perspective that is not present in the Immigration Courts.

While we may lack the advantage of a face-to-face observation of the witness, we have the very substantial, and much underrated, advantage of being able to review a written transcript. We also have a talented professional staff to assist us in reviewing the record. In addition, the absence of personal interaction with the parties and their counsel in the trial courtroom insulates us from the almost inevitable, and often distracting, frustrations and extraneous factors that could accompany such personal interaction, particularly in a "high-volume" trial system like the Immigration Court. Moreover, we have the opportunity for collegial discussion and the application of shared expertise to difficult appellate issues.

Therefore, it is not clear to me why our vantage point is necessarily less revealing than that of the Immigration Judge and why we want to give such great deference to the Immigration Judge, rather than relying on our own expertise and sound, independent judgment after review of the written record on appeal. I find it interesting that the majority embraces a rule that strongly prefers the assessment of credibility below to that we might reach through an exercise of our own independent, expert judgment on a de novo basis.

## B. Putting Uniformity in Context

My second problem with the majority's rule is that the uniformity we may achieve through its application is likely to make it more difficult for an asylum applicant who has received an adverse credibility finding to prevail on appeal. The overwhelming majority of appeals that we adjudicate are from aliens, rather than the Immigration and Naturalization Service. In the asylum area, almost all credibility appeals involve an alien who has been found incredible by an Immigration Judge. A significant number of appellants,

even in asylum cases, are unrepresented, and others are represented in what we might consider a marginal fashion.

In effect, we are instructing Board Members to defer to reasonable rulings by Immigration Judges even where another outcome might have been justified on the record. I have considerable misgivings about this rule, particularly in asylum cases, notwithstanding its apparent administrative and systemic advantages. Also, while the majority's rule is likely to achieve more uniform affirmation of adverse credibility findings on appeal, it does not, in any way, promote uniformity of credibility decisions among the many Immigration Courts.

## C. Correct Results?

While the majority's rule might well help to promote appellate results that are uniformly "within the zone of reasonable," reasonable results are not necessarily correct results in individual cases. Obviously, credibility findings are often judgment calls, and reasonable adjudicators can, and often do, reach opposite conclusions on the same or similar facts.

My primary problem with the majority's rule is that, as applied to the case before us, it produces a result that is, perhaps, within the zone of reasonable outcomes, but not, in my view, the correct or best outcome. In the future, I undoubtedly will be required by the majority's standard of deference to vote for other facially reasonable results that my expertise and judgment tell me are wrong as applied to the individual appellant. Such a rule gives me pause.

## II. DE NOVO REVIEW PRODUCES A DIFFERENT RESULT

### A. The Respondent's Testimony

In the particular case before us, the respondent is a 29-year-old native and citizen of Bangladesh who entered the United States on September 2, 1994, without valid documentation. The respondent testified at his deportation hearing that in 1985 he joined the Jatiyo Party, the political party of then-President Mohammed Ershad. In 1987, the respondent was appointed to the position of Organizing Secretary for his sub-district, a job that involved numerous duties, including weekly meetings with President Ershad. The respondent testified that in 1991, after President Ershad was defeated in general elections, members of the Bangladesh National Party ("BNP") and Awami League, two rival political parties, began to search for him. Members of these political parties allegedly planned to recruit the respondent or to kill him in retaliation for his role in the Jatiyo Party.

The respondent testified that on July 12, 1993, BNP members forcibly entered his house in an effort to find him. Although the respondent was not at home at the time, the intruders threatened his parents and physically assaulted other family members in the house. Later that month, BNP and

Awami League members returned to the respondent's house, and as he attempted to flee, they severely beat him about the head with a bamboo stick. The respondent, who was rendered unconscious from the beating, required medical treatment for 3 weeks after the incident. Finally, the respondent testified that police issued a warrant for his arrest on July 15, 1994, falsely alleging that he had committed various political crimes.

Because he feared arrest and believed he would endure further persecution, the respondent secured a false passport and fled Bangladesh. The respondent fears returning to Bangladesh because he believes that his persecutors will kill him. Members of the BNP and Awami League have told the respondent's father that they are looking for the respondent and plan to kill him.

## B. The Immigration Judge's Decision

Citing *Matter of Mogharrabi, supra*, the Immigration Judge found that the respondent's testimony "was vague and lacking in specifics and details." In his decision, the Immigration Judge provided various examples of the respondent's inconsistent testimony, most of which involved dates that conflicted with his asylum application. The Immigration Judge concluded that the sparse documentary evidence of record failed to support the respondent's unbelievable allegations of persecution. Finally, the Immigration Judge found that the respondent's fear of persecution was not well founded considering the recent participation of the Jatiyo Party with the coalition government, and he therefore denied the applications for asylum and withholding of deportation.

## C. De Novo Analysis

The respondent alleges on appeal that the Immigration Judge erred "by discounting the detailed oral testimony of [the respondent]." The respondent contends that his testimony was believable and sufficiently detailed to support adequately his asylum claim. The Ser6ice has not filed an appella4e brief addressing this argument.

Although the Immigration Judge recognized that the respondent submitted documentary evidence and background materials to support his asylum application, the Immigration Judge decided to give "little weight" to certain pieces of this evidence. Specifically, the Immigration Judge afforded little weight to two letters submitted by the respondent from the president and secretary of the local chapter of the Jatiyo Party in Bangladesh's Shunamgonj District. I disagree with the Immigration Judge's assessment that the respondent "seemed to have very little knowledge as to how those letters were obtained."

I observe, as did the Immigration Judge, that these letters are undated. However, the respondent testified at his hearing that he asked his father, who

still lives in Bangladesh, to secure these letters from the Jatiyo Party in order to substantiate his claim of party membership. He also testified, plausibly, that his father mailed the letters to him in the United States approximately 4 to 6 months prior to the deportation hearing. I do not agree, therefore, that the letters deserved limited probative weight.

Next, the Immigration Judge concluded that the respondent's testimony was "vague, lacking in specifics and details," and was delivered in a halting manner. However, the record reveals that the respondent provided *numerous specific details* to support his claim. For example, the respondent demonstrated his knowledge of how President Ershad organized Bangladesh into district and sub-district level administration. The respondent testified that there were 360 subdistricts and 64 districts in Bangladesh. He also provided details regarding his position as a party "organizing secretary" at the sub-district level.

Furthermore, although I obviously did not have the benefit of observing the manner in which the respondent testified, I decline to assume that his "halting" manner of testifying indicated that he was untruthful, especially when considering the nervousness that is often precipitated by appearing at a tribunal in any country, let alone a foreign country. *See Matter of B-,* 21 I&N Dec. 66 (BIA 1995) (finding that the respondent's tendency to look at the wall or table, instead of at the Immigration Judge, did not necessarily indicate deception). *See generally Paredes-Urrestarazu v. INS*, 36 F.3d 801, 818 (9th Cir. 1994) (stating that nervousness is a factor properly considered in assessing credibility). My own professional experience and observation is that halting delivery of a presentation in a formal setting often has causes other than untruthfulness.

The Immigration Judge also stated in his oral decision that the respondent "seemed to have some confusion about the February of 1991 elections," and gave contradictory testimony about whether the Jatiyo Party and President Ershad actually took part in the elections or won any seats. However, my reading of the record indicates otherwise.

Although the respondent first stated that the general elections occurred in September 1991, he soon thereafter stated correctly that they occurred in February 1991. The respondent demonstrated his familiarity with the election results, explaining that Jatiyo Party members were elected and that President Ershad contested the election. The respondent also testified that President Ershad was imprisoned, but was "nominated from prison" for the presidency. The Department of State's *Comments on Country Conditions and Asylum Claims* for Bangladesh confirm that the Jatiyo Party won 35 Parliamentary seats in the 1991 elections and that President Ershad remains in prison (although this source does not reveal when President Ershad was imprisoned). Bureau of Democracy, Human Rights and Labor, U.S. Dep't of State, *Bangladesh - Comments on Country Conditions and Asylum Claims* (May 1995) [hereinafter *Comments*]. In light of these facts, I do not agree that

the respondent supplied vague or confusing testimony about the participation of the Jatiyo Party or President Ershad in the 1991 elections.

The Immigration Judge's concerns about the respondent's credibility also centered on testimony concerning dates when he met with President Ershad. After testifying that he joined the Jatiyo Party in 1985, the respondent stated that he met with President Ershad in 1982. When confronted with that discrepancy, the respondent stated that he could not give the exact dates because he did not quite remember them. I note that the respondent testified that he has trouble remembering things, which could be one of a number of reasons for the discrepancy.

I also recognize that the respondent gave dates in his testimony about when rival political parties harmed or attempted to harm him that differed from his written asylum application. The Immigration Judge noted that the respondent testified that members of rival political parties looked for him at his family's house in July 1993. The respondent also testified that later the same month, the same people returned and found the respondent, thereupon beating him with a bamboo stick. The Immigration Judge contrasted this testimony with the respondent's asylum application, which states that in March 1991, members of rival political parties looked for him at his family house and that in January 1992, the same people beat him with a bamboo stick. The Immigration Judge also noted that the respondent failed to testify about an incident described in his asylum application, which states that in July 1993, members of the BNP and the police beat him while he was demonstrating.

The dates provided in the respondent's testimony do not match the dates provided in his asylum application. However, as discussed above, the respondent asserted while testifying that he has trouble remembering dates, a characteristic that was most likely compounded by the fact that many incidents involving the respondent and rival political parties occurred. Difficulties in remembering dates are certainly a common problem with respect to victims of persecution. *See generally* Tina Rosenberg, *To Hell and Back*, New York Times Magazine, Dec. 28, 1997, at 32, 34. For example, according to that recent article on refugees who had been victims of torture:

> Early studies suggest that the brain processes a traumatic event very differently from an everyday one and might keep the trauma from being integrated with other memories. That may explain why trauma sufferers have amnesia or can retrieve only fragments, like a smell or sound, or cannot put the events behind them.

*Id*. at 34.

Our decisions have been circumspect about using dates as a basis for adverse credibility findings in asylum cases. *See Matter of B-*, 21 I&N Dec. 66, 70. I also observe that the respondent was not given an opportunity to explain the events surrounding the July 1993 demonstration, and he remarked at the end of his hearing that he had not completely addressed the full range of events while testifying.

Overall, the respondent presented oral testimony that was sufficiently detailed and plausible when considered in conjunction with the background evidence in the record concerning conditions in Bangladesh. *See Matter of Mogharrabi, supra.* The "omissions" from the asylum application relied upon by the majority do not seem remarkable or particularly significant in the overall context of the case. The real issue is whether respondent's testimony is negated because it contains dates that differ from those in the respondent's written asylum application.

The majority concludes, as reasonable adjudicators perhaps could, that the respondent is likely an imposter who has fabricated his claim, or the material portions of it. I, on the other hand, take him for what he appears to me to be: a persecuted individual with a less than perfect memory who was not properly prepared to testify at his asylum hearing.

The majority also relies on the failure of counsel to *specifically* address the adverse credibility determination on appeal. While it undoubtedly would have been helpful if counsel had done a better job in his brief, he did, in fact, identify credibility as a disputed issue. The failure of counsel to be more specific is certainly annoying and inconvenient for us, but obviously has not prevented us in any meaningful way from being able to identify and discuss in detail the relevant issues raised by this appellate record.

I tend to doubt that important issues such as asylum should turn to such a great degree on the amount of enlightenment that counsel is able to provide to us, an already expert Board whose sole function it is to review appellate records. It is also noteworthy that imperfect though counsel's appellate effort might have been, it is still more edifying than that put forth by the Service, which, thanks to the majority's generous definition of deference, has prevailed in this case without even bothering to take a position on appeal.

In reviewing the record de novo, I find that it does not warrant an overall adverse credibility finding. *See Matter of V-T-S-*, 21 I&N Dec. 792, 796 (BIA 1997) (citing *Matter of Dass*, 20 I&N Dec. 120 (BIA 1989), *modified on other grounds, Matter of Mogharrabi, supra*); *Matter of Kasinga*, 21 I&N Dec. 357, at 364 (BIA 1996). In my view, the confusion or discrepancies concerning temporal details does not indicate that the respondent fabricated his claim, nor does it undermine his claim to such a degree as to negate the claim's substance. *See Matter of Lugo-Guadiana,* 12 I&N Dec. 726, 729 (BIA 1968) (holding that a credibility determination "apprehends the overall evaluation of testimony in light of its rationality or internal consistency and the manner in which it hangs together with other evidence") (citation omitted). *See generally Paredes-Urrestarazu v. INS, supra*, at 817.

## D. Past Persecution

Accepting as true the events related in the respondent's testimony, I find that the respondent was persecuted by members of the BNP and Awami

League "on account of" his political opinion. *See* section 101(a)(42)(A) of the Act, 8 U.S.C. § 1101(a)(42)(A) (1994); *Perlera- Escobar v. Executive Office for Immigration*, 894 F.2d 1292 (11th Cir. 1990); *Matter of H-*, 21 I&N Dec. 337 (BIA 1996); 62 Fed. Reg. 10,312, 10,342 (1997) (to be codified at 8 C.F.R. § 208.13(b)(1) (interim, effective Apr. 1, 1997). The respondent's testimony, which is supported by documentary evidence, reveals that the respondent was a member of the Jatiyo Party and enjoyed access to President Ershad. The evidence establishes that members of the BNP and Awami League, who were aware of the respondent's party membership, severely beat him because of his political opinion. The respondent also testified credibly that the BNP-controlled government police issued a warrant for his arrest, based on false allegations, using their authority under the Special Powers Act of 1974. The respondent's claim finds support in the State Department's *Comments, supra*, at 7, which acknowledge that the Special Powers Act "is used as a method of preventive detention and in some cases to settle political scores."

## E. Future Persecution

"A finding of past persecution gives rise to a regulatory presumption that the applicant has a well-founded fear of future persecution." *Matter of H-, supra,* at 346. Here, I find that the Service did not rebut the presumption that the respondent has a well-founded fear of persecution upon returning to Bangladesh. *See INS v. Elias-Zacarias*, 502 U.S. 478 (1992); *INS v. Cardoza-Fonseca,* 480 U.S. 421 (1987); *Matter of C-A-L-,* 21 I&N Dec. 3305, at 4 (BIA 1997) (citing *Matter of Mogharrabi, supra*); 8 C.F.R. § 208.13.

From this record, it is reasonable to conclude that government authorities and political party members who targeted the respondent in the past continue to have the inclination and the ability to punish the respondent for his political beliefs. *See Matter of D-V-*, 21 I&N Dec. 77 (BIA 1993). This is especially true considering that the respondent fled Bangladesh while a warrant for his arrest (on allegedly trumped-up charges) remains outstanding. Evidence of current country conditions in Bangladesh also supports the respondent's concerns for his physical safety should he return to his native country. Although the *Comments, supra*, at 7, assert that Jatiyo Party members "are not subject to systematic persecution by the government," the State Department's *Country Reports on Human Rights Practices for 1995* (incorporated by reference into the *Comments* and the State Department Advisory Opinion) provide some support for the respondent's well-founded fear of persecution. Committees on International Relations and Foreign Relations, 104th Cong., 2d Sess., *Country Reports on Human Rights Practices for 1995* (Joint Comm. Print 1996) [hereinafter *Country Reports*]. Specifically, the *Country Reports* indicate that "[v]iolence, often resulting in killings, is a feature of the political process." *Id*. at 1295.

The record also contains a State Department Advisory Opinion dated August 9, 1996. *See* 62 Fed. Reg. 10,312, 10,341-42 (1997) (to be codified at 8 C.F.R. § 208.11) (interim, effective Apr. 1, 1997) (entitled "Comments from the Department of State"). Notwithstanding that the State Department Opinion recognizes that the Jatiyo Party won 29 Parliamentary seats in the June 1996 elections and is supporting the Awami League-led government, the opinion concludes that "politics in Bangladesh is violence-prone." Against this factual context, I find that a reasonable person in the respondent's circumstances would fear persecution upon return to Bangladesh, and the Service has provided insufficient evidence to rebut this presumption with respect to this individual respondent.

Based on the foregoing, I conclude that the respondent suffered past persecution on the basis of his political opinion, and that a reasonable person in his position would have an objective basis (that is, a 10 percent chance) to fear persecution on the basis of political opinion. *See INS v. Cardoza-Fonseca, supra*, at 430-32.

Although the respondent entered the United States with fraudulent documentation, I find that this does not warrant an unfavorable exercise of discretion in this case. I therefore would grant the respondent's request for asylum. *See Nkacoang v. INS*, 83 F.3d 353 (11th Cir. 1996); *Matter of H-, supra; Matter of Pula,* 19 I&N Dec. 467 (BIA 1987) (discussing factors to analyze in exercising discretion); 62 Fed. Reg. 10,312, 10,342-43 (1997) (to be codified at 8 C.F.R. § 208.14) (interim, effective Apr. 1, 1997).

## III.  CONCLUSION

Perhaps the future of this Board is to move away from de novo review of factual issues and to confine ourselves to the more comfortable area of resolving disputed legal points. Maybe, in the long run, we should function more like an appellate court than a group of subject matter experts seeking to do justice in individual cases within our jurisdiction. Possibly, the appellate uniformity and restraint promoted by the majority's rule will outweigh the disadvantage of requiring individual Board Members to affirm reasonable, but arguably incorrect, decisions by Immigration Judges in certain cases.

Nevertheless, at present, I am not convinced that the majority's concept of deference justifies its restriction on true de novo review. I also believe that it has led them to the wrong result in this asylum case.

Consequently, I respectfully dissent.

*DISSENTING OPINION:* Lory D. Rosenberg, Board Member

I respectfully dissent.

In denying the appeal before us and designating it as a precedent decision, the Board majority articulates, as an adjunct to its recent precedent decisions governing asylum adjudications, a three-part test related to determining

credibility. Notwithstanding my agreement that, theoretically, establishing guidelines furthers the cause of fairly and reasonably assessing evidence in the asylum context where the issues presented often involve life and death consequences, I cannot join this decision.

In my opinion, the usefulness of the test announced today, and its value as a means either to assess the factual underpinnings of an asylum seeker's claim or to determine the legal conclusions we draw under *INS v. Cardoza-Fonseca*, 480 U.S. 421 (1987), is belied by the outcome reached by the majority. Whatever the intentions of those joining the majority decision, this test was invoked today to deny the existence of a well-founded fear of persecution. I dare say, based on my participation in recent published decisions and my reexamination of past published decisions, it will not be the last time.

In the context of asylum claims, credibility determinations are findings that are inextricably tied to the respondent's burden of proof and can make or break a claim. I do not agree that the burden of proof imposed generally on asylum seekers by the majority's test in this case or in its predecessors is an appropriate one. *See, e.g., Matter of Y-B-*, 21 I&N Dec. 1136 (BIA 1997); *id.* (Rosenberg, dissenting); *Matter of S-M-J-*, 21 I&N Dec. 722 (BIA 1997); *id.* (Rosenberg, concurring); *see also Matter of O-D-*, 21 I&N Dec. 1079 (BIA 1998); *id.* (Rosenberg, dissenting). Even if the imposition of this burden as articulated were appropriate, I have not found the factual records made in the majority of hearings that I have reviewed over the past 2 1/2 years to be fully considered and assessed by either the Immigration Judge or the Board. My differences with the majority's readings of the factual records in many cases and the legal conclusions they have drawn from them are addressed in my separate opinions in *Matter of C-Y-Z-*, 21 I&N Dec. 915 (BIA 1997); *Matter of E-P-*, 21 I&N Dec. 860 (BIA 1997); *Matter of T-M-B-*, 21 I&N Dec. 775 (BIA 1997); *Matter of V-T-S-*, 21 I&N Dec. 792 (BIA 1997); and *Matter of C-A-L*, 21 I&N Dec. 754 (BIA 1997). The concerns with the limitations presented by the standard we articulated and about which I cautioned in *Matter of S-M-J-, supra* (Rosenberg, concurring), have, regrettably, been realized.

In addition, unlike the Chairman, I do not view the approach taken by the majority in this case as merely one way, among reasonable possibilities, to adjudicate the respondent's claim on appeal. I find the three-part test imposed by the majority to be unreasonable, both in conception and in application, and to fall short of what is required of us by law. Consequently, I dissent and write separately in an effort to clarify both where I believe that the majority has erred, and to suggest what a prudent asylum seeker must do to satisfy the asylum law as we apply it at the Board of Immigration Appeals, which, for most practical purposes, is how we apply it in this country.

# I. TREATMENT OF DISPARITIES IN AN ASYLUM CLAIM IN RELATION TO THE ASYLUM SEEKER'S CREDIBILITY AND BURDEN OF PROOF

I will not belabor the particulars of the respondent's claim or the better ways to interpret and judge it, as Chairman Paul W. Schmidt has done a yeoman's job in articulating the salient points in that regard in his dissent. Suffice it to say that, as I read the heart of the claim as presented in the record before us, the respondent has provided evidence of his membership in a political party and evidence of persecutory actions taken against him by opposing political forces as a result of his membership and political affiliation.

These basic facts are not controverted or contradicted in any way, although the record contains disparities between the respondent's application for asylum and the testimony he provided at his hearing *with regard to the dates* on which he and his family were attacked by members of the opposing political parties. Inasmuch as our process, in practice, does not provide the possibility of a meaningful clarification of these discrepancies, based on the fact that I do not find these discrepancies to go to the heart of the respondent's claim and the principle that asylum seekers should be given the benefit of the doubt, I would grant asylum.

The crux of the matter in this case is whether, despite his having to make corrections during his testimony as to when the events testified to occurred, the respondent failed to provide evidence that is credible. Put another way, is it reasonable, fair, appropriate, or lawful for the majority to uphold the decision of the Immigration Judge that the respondent lacked credibility requiring denial of his claim? I do not think that question can be answered in the affirmative. As I noted in my concurrence in *Matter of S-M-J-, supra*, at 733:

> Perhaps what is most important about this decision is what we are not holding. Nowhere do we propose that an asylum seeker is presumed to be fabricating her claim or otherwise to lack credibility. *Figeroa v. INS*, 886 F.2d 76 (4th Cir. 1989) (emphasizing that the fact an applicant is an alien does not mean the Board is entitled to presume he is a liar). . . . In other words, there is no presumption that an asylum applicant's testimony is to be treated as other than truthful . . . .

But that is not what we are holding here today, is it? Today, according to the majority, we are stating that certain discrepancies, alleged to be "actual" and supported by allegedly specific and cogent reasons, undermine the respondent's claim of persecution. That an asylum seeker's testimony before the Immigration Judge is internally consistent does not seem to matter. That an asylum seeker provided an explanation for discrepancies between his written application and his testimony regarding the dates he assigned to events that make up the core of his claim of persecution also is disregarded.

### A. Proper Allocation of Presumptions and Burdens

The majority treats the disparities in the respondent's recitation of the dates on which the attacks against him and his family occurred at worst, as revealing his claim, in its entirety, to be a sham, and at best, as defeating his burden of proof. Rather than rule on the merits of the respondent's appeal on the record *as a whole*, the majority has chosen to sidestep that determination and curtail administrative appellate review in favor of what amounts to *a presumption* that any discrepancies in the record made in the case of an asylum seeker cast doubt on the entirety of his claim, relieving us of our responsibility to review his claim on appeal. *See Matter of O-D-, supra.* Nevertheless, given the cited disparities in the record before us, the critical question for both the Immigration Judge and the Board is—or should be—what further steps should we take to ascertain what occurred and to judge the respondent's claim?[1] *Matter of S-M-J-, supra.*

If we wish to reduce asylum admissions and simply deny the claim outright, we can pinpoint every discrepancy, claiming that each goes to the heart of the claim. We can applaud, or at least not criticize, the Immigration Judge, no matter what shortcomings appear in his or her decision and what outstanding questions or concerns remain in our minds. We can differentiate our role as an appellate administrative Board and simply, narrowly interpret our appellate authority and defer to the decisions made in the denials appealed to us. And we can, at the same time, alleviate any burden on the Immigration Judge to actually determine the underlying facts making up the asserted claim of persecution. In my view, in imposing its three-part test, the majority has elected to do all of the foregoing. These are not my objectives, and even if they are not meant to be the objectives of those joining the majority, they are furthered by this decision.

As a practical matter, a presumption, at worst of fraud and at best of inadequacy, has insinuated its way into all asylum adjudications made by the Board. I venture to guess that such a presumption exists in many adjudications of asylum claims conducted by Immigration Judges. By contrast, this is not consistent with the humanitarian nature of asylum determinations. *See Matter of Pula,* 19 I&N Dec. 467, 476 (BIA 1987) (Heilman, concurring) (recognizing that asylum provisions are *humanitarian* in their essence and that the "normal" immigration laws cannot be applied in their usual manner to refugees).

There is no basis in the law for such a presumption. Indeed, in *Matter of S-M-J-, supra*, we cited with approval the guidelines for asylum adjudicators set forth in the *Handbook on Procedures and Criteria for Determining Refugee Status under the 1951 Convention and the 1967 Protocol relating to the Status of Refugees* (Geneva, 1992) [hereinafter *Handbook*], observing that

---

[1] I address the role to be played by the asylum seeker, and his or her attorney, if represented, below.

"while the burden of proof in principle rests on the applicant, the *duty to ascertain* and evaluate all the relevant facts is shared between the applicant and the examiner." *Matter of S-M-J-, supra*, at 729 (quoting *Handbook, supra*, para. 196, at 47) (emphasis added). Moreover, we advised that it is the Immigration Judge's role to "[e]nsure that the applicant presents his case as fully as possible and with all available evidence." *Id*. (quoting *Handbook, supra,* para. 205(b)(i), at 49). Our citation of these provisions is consistent with the teaching of the *Handbook* that "it may be necessary for the examiner to clarify any apparent inconsistencies and to resolve any contradictions in a further interview, and to find an explanation for any misrepresentation or concealment of material facts." *Handbook, supra*, para. 199, at 47.

In addition, as we recognized in *Matter of Fefe*, 20 I&N Dec. 116 (BIA 1989), an application for asylum requires the asylum seeker's testimony. As that case made clear, while the minimum testimonial requirement is to swear to the truth of the written application, rarely does the examination stop at this point. Indeed, the Board specifically contemplated that there would also be instances "where an alien establishes eligibility for asylum *by means of his oral testimony when such eligibility would not have been established by the documents alone*." *Id*. at 118 (emphasis added). I note that the *Handbook, supra,* also anticipates that completion of a "standard questionnaire" ordinarily will not provide an adequate basis on which to judge the claim, and that it will be necessary to gain the confidence of the asylum seeker "in order *to assist* the latter in putting forward his case and in fully explaining his opinions and feelings." *Id*. para. 200, at 47-48 (emphasis added).

These authorities seem to envision the role of the adjudicator as one of assisting the asylum seeker to clarify and substantiate his case, not as one of defeating his asylum claim by contrasting his application with his testimony. None of these authorities support a sub silentio presumption of fraud or failure to meet the burden of proof, a presumption which I believe the majority has applied and will continue to apply under the test announced today.

Although the respondent may bear the burden of proof, and although he may be represented by counsel, a hearing involving a claim for asylum is not merely an adversarial contest on an abstract or intellectual level in which two parties spar with one another until one loses. A removal hearing involving the possibility of deportation, even when the threat to life and safety are absent, is not a sporting event. The Board has long acknowledged that ready dismissal of a respondent's claims on technicalities will not do. *See Matter of Martinez-Solis*, 14 I&N Dec. 93, 95 (BIA 1972) (holding that a contested deportation hearing is a "quest for truth," not a sporting event); *Matter of K-H-C-,* 5 I&N Dec. 312, 314 (BIA 1953). While it is true that the Immigration and Naturalization Service bears some responsibility in this regard as well, adjudicators, including Immigration Judges and the Board, should assist in perfecting and clarifying the asylum claims presented to them. In my view, the majority's decision obviates that responsibility.

### B. The Substantial Evidence Standard Requires
### Consideration of the Record as a Whole

The majority's decision, as discussed by the Chairman in his separate opinion, and as I discuss below, is not supported by substantial evidence in the record. To be sustained, substantial evidence must support the agency's decision, and the agency may not choose to rely selectively on only that part of the evidence that may support its conclusion. Rather, an agency's consideration of an application for asylum requires that the adjudicator provide a reasoned decision which reflects that he or she considered and weighed the evidence on the record as a whole. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 491 (1951) (holding that the "substantial evidence" standard has been understood to mean that the adjudicator's conclusions are expected to take into account, and reflect in his or her decision, consideration of both those facts in the record that support the conclusion, and the evidence in the record that detracts from it); *see also Cordero-Trejo v. INS*, 40 F.3d 482, 487 (1st Cir. 1994) (stating that deference is not due to the agency "where findings and conclusions are based on inferences or presumptions that are not reasonably grounded in the record, viewed as a whole or are merely personal views of the immigration judge") (citations omitted).

There is longstanding authority recognizing the importance of testimony. *See Matter of Sihasale*, 11 I&N Dec. 531, 532-33 (BIA 1966) (holding that the asylum applicant's testimony must be accorded the most careful and objective evaluation possible as it may be the only evidence available); *see also Matter of Joseph*, 13 I&N Dec. 70, 74 (BIA 1968) (stating the applicant must have a "reasonable opportunity" to present his proofs for the "stakes are high"). I do not read these authorities as permitting us to rely on testimony that, although internally consistent, appears to contain discrepancies in relation to a written asylum application, as a basis to deny asylum claims. *Cf. Matter of Fefe, supra.*

Rather, I read these authorities as emphasizing the importance of testimony in the asylum context, and as requiring us to consider and clarify explanations for any inconsistencies between testimony and a written application. I view it as appropriate to go even further and seek out the actual facts underlying the claim asserted by the asylum seeker. *See Handbook, supra*, paras. 196, 199, 200, 205, at 47-49. Moreover, recognition of the special circumstances faced by persons seeking asylum has not been obliterated, at least on paper. *Matter of S-M-J-, supra* (citing the *Handbook* and finding that the benefit of the doubt is to be extended to an asylum applicant who may be unable to substantiate his statements but whose testimony is generally credible and does not run counter to generally known facts).

At the time I wrote my concurrence in *Matter of S-M-J-, supra*, I joined the majority and limited my concerns to a concurrence, hoping that the Board might deal fairly with the claims of asylum applicants. Over the past year,

however, our precedent decisions have reflected that the matters about which I had hesitation in joining *Matter of S-M-J-* have taken full hold. For example, although the majority decision in *Matter of S-M-J-* emphasizes that the Immigration Judge is expected to assist in clarifying and bringing out evidence in support of the asylum seeker's claim, this record is devoid of any indication that the Immigration Judge took any steps to encourage or assist the applicant in providing any such additional evidence or clarification.

Circumstances such as these, in which the Immigration Judge fails to develop the facts during a hearing on an asylum application and then criticizes an asylum seeker for presenting inconsistent evidence or not presenting some evidence the Immigration Judge finds to be important, should not constitute a reasonable basis to dismiss an asylum claim on the grounds the respondent did not establish his credibility or meet his burden of proof. But it is under circumstances such as these that the majority now is pronouncing a deferential test that relies almost exclusively and uncritically on the Immigration Judge's conduct of the hearing.

The majority's decision in this and other cases fails to consider all of the evidence of record and to weigh it fairly in its totality. Regrettably, the majority's decision seems to prefer the quickest way out of exercising our authority to adjudicate on review the tough questions posed by asylum claims, and opts for acquiescence to the decision of an individual Immigration Judge. Were it not for the fact that well over 90 percent of the appeals taken to the Board from decisions of Immigration Judges generally, and from asylum decisions specifically, are taken by individuals whose claims have been denied and who have been ordered removed, the majority's deference might not be of such import. As it is, the majority's position virtually obviates the asylum seeker's right of appeal within the administrative context.

## C. The Approach Taken by the Majority Violates the Respondent's Appellate Rights

The approach taken by the majority violates the due process right to administrative appeal provided by regulation and in accordance both with constitutional considerations and the *Handbook*.[2] *See* 8 C.F.R. §§ 3.38, 242.2 (1997); *see also Maldonado-Perez v. INS*, 865 F.2d 328, 333 (D.C. Cir. 1989) (holding that the Act implements the constitutional requirements of a fair hearing); *Handbook, supra*, paras. 190-192(vi), at 45-46.

The regulations explicitly recognize the Board as an appellate authority and authorize the Board to exercise its independent (de novo) judgment in appeals, empowering us to take whatever action is appropriate and necessary to achieve a disposition of the case. 8 C.F.R. § 3.1(a)(1) (1997). I read this

---

[2] Although not binding on the Immigration Judge or the Board, I believe that adherence to the letter and spirit of these guidelines is consistent with the purpose of the 1967 Protocol, to which the United States is a signatory. *See also INS v. Cardoza-Fonseca,* 480 U.S. 421 (1987).

appellate imperative as referring to our responsibility to achieve a fair and reasonable disposition, taking into account the entire record. In my view, a standard favoring affirmance of the Immigration Judge, such as that adopted by the majority in this precedent, and other recent asylum decisions, fails to satisfy this delegation of authority both in spirit and in name. *See, e.g., Matter of O-D-, supra; Matter of Y-B-, supra; Matter of A-E-M-*, 21 I&N Dec. 1157 (BIA 1998) (*see also* Rosenberg, dissenting in each of those decisions).

In addition, even were appeal to the Board not provided by regulation, the basic procedural requirements proposed by paragraphs 190, 191, and 192 of the *Handbook, supra*, at 45-46, provide that, if the applicant is not recognized as a refugee, he should be given a reasonable time to appeal for a "formal reconsideration" of the decision, either to the same or to a different authority. *Id.* para. 192(vi), at 46. Clearly, federal appellate review under our system does not purport to constitute "reconsideration" of the decision; independent administrative review, however, is de novo and does allow, in essence, for "reconsideration" of an adverse refugee determination.

The limitations on independent review imposed by the majority not only in this decision, but in its series of recent opinions such as *Matter of O-D-, supra,* and *Matter of Y-B-, supra*, and in several, significant, but unpublished, en banc opinions issued over the past year, make clear the intentions of the majority to limit substantive administrative appellate review, and to uphold the decisions reached by Immigration Judges without regard to whether they are correct. Those decisions, like this one, impermissibly restrict our review and violate the rights of appellants coming before us.

## II. ANALYSIS OF THE MAJORITY'S NEW TEST AS APPLIED

Let us see how this respondent rates under the majority's new test for upholding adverse credibility findings (supporting the dismissal of asylum claims):

*First, the "inconsistencies and omissions actually present" (and going to the heart of the claim) dismissal ground.* According to the majority the respondent failed the three-part test because he was inconsistent about the dates when things happened to him. The majority twists this to mean he was inconsistent about matters going to the heart of his claim, when in fact that is not true, and when, in fact, the very circuit they cite in support of this test has stated quite distinctly and repeatedly that errors about dates do not necessarily undermine a claim. *See Osorio v. INS*, 99 F.3d 928, 931 (9th Cir. 1996); *Aguilera-Cota v. INS*, 914 F.2d 1375, 1381 (9th Cir. 1990) (citing *Turcios v. INS,* 821 F.2d 1396, 1399 (9th Cir. 1987)); *cf. de Leon-Barrios v. INS*, 116 F.3d 391 (9th Cir. 1997).

The essence of the respondent's claim is consistent. He has been an active member of the Jatiyo Party and nothing in the record directly controverts or contradicts that asserted fact; he held a particular position as a local secretary

and nothing controverts or contradicts that asserted fact. He was attacked and injured, and his home was invaded and his family questioned, and nothing controverts or contradicts those asserted facts. He attributed the attacks and harm he suffered to the BNP, who he contends have worked in the service of the ruling party that ousted General Ershad, who led the Jatiyo Party to which he belonged, and nothing in the record controverts or contradicts those asserted facts; in fact the Department of State reports in the record support it.

As the record reveals, the majority's reliance on *de Leon-Barrios v. INS, supra,* is inapposite. Indeed, to the extent a hearing before an Immigration Judge is an adversarial one, it is the Service, rather than the Immigration Judge or the Board, who should be the respondent's adversary. In this case, the Service has submitted no evidence to contravene the respondent's claim. I note that the respondent's testimony at the hearing is internally consistent. It is his asylum application (made just after he fled Bangladesh, came to the United States, and applied for asylum), and his testimony at the hearing, where he provided significant detail not included in his application, that differs. This testimony is competent evidence. *Matter of Fefe, supra; Handbook, supra.*

In addition, the respondent provided a reasonable explanation—that he has problems remembering dates—for the inconsistencies in dates that the majority finds are "actually present." This explanation is plausible in light of the fact that there is no evidence that the respondent normally has a razor sharp memory and is posing at having a bad memory to cover up bungling a fabricated claim. It also comports with what we know generally about the effects of trauma on memory. When he provided the basics of his asylum claim in completing the application, the respondent had just arrived in the United States and his focus was on quickly relating what had happened to him and what he feared would happen. When he testified, he was more removed from the exigencies that prompted his flight, and was in a position to elaborate and provide the kinds of detail and specifics we expect of asylum applicants.

What, then, is undermining his claim? Could it be that what is undermining his claim is the majority's new test and how the majority has elected to apply it? In particular, did the Immigration Judge provide "numerous examples" of inconsistencies as the majority claims he did? No. He provided two examples of misstated dates and concluded that these "cast doubt on the reliability of the respondent's claim in its entirety."

Did the Immigration Judge provide a "comprehensive decision" as the majority claims he did? No, he did not. He provided a decision that raised questions he never pursued during the hearing, although he had the respondent right before him and he had the authority to inquire, to clarify, and even to assist the respondent in "putting forward his case and in fully explaining his opinions and feelings," as the *Handbook* contemplates an adjudicator might do in determining the truth of a claim involving undeniably politically motivated harm. *Handbook, supra*, para. 200, at 47-48.

*Second, the "Immigration Judge relied on specific and cogent reasons" dismissal ground*. It may be specific to say that the respondent got the dates wrong or gave differing dates on which the reported incidents occurred. But, I do not consider reliance on inconsistencies regarding the dates of traumatic occurrences that took place 4 or 5 years before the date on which they were either recorded or discussed to constitute a *cogent* reason for rejecting the heart of the claim—that this asylum seeker was persecuted and continues to be sought out on account of his opinion and his affiliation with a political party that is not in power. This is particularly so when the record reflects evidence that the respondent had problems with his memory.

Given their apologetic protestations that they recognize how an applicant who fled persecution may have trouble remembering dates, I doubt the majority believes such reasons are cogent either. *Matter of A-S-*, 21 I&N Dec. 1106, 1110 (BIA 1998). The majority, however, is content to apply a new "too big a gap, too cramped a memory" rule as a corollary to part two of their new test. This new corollary places significance on the breadth of difference in times of persecutory events reported, as though getting the dates of these occurrences wrong by 1 month or 6 weeks might be reasonable, but testifying to a 2-year discrepancy is unreasonable.

The new rule also seems to suggest that conflating the events forming the heart of one's claim into a 1-month period is "even more significant." M*atter of A-S-, supra*, at 1110. As with the first of the questions associated with this new "too big a gap" corollary, the majority opinion fails to indicate why this error is probative of a finding the respondent provided incredible testimony. There is no evidence that such an error reeks of fabrication because it was off by more than a year or because the respondent visualized or recalled the attacks on him and his home as occurring in a compressed period of time. Furthermore, the respondent's halting and hesitant manner is equally or more attributable to poor memory and nervousness for legitimate reasons, as it is to fabrication.

The majority's support of the Immigration Judge's reliance on disparities in dates, where he has sought no explanation during the course of the hearing, is only a step away from the Board's looking to every other possible reason for a respondent facing threatened harm rather than accepting that the nature of the harm was political. *See Osorio v. INS*, 18 F.3d 1017, 1031 (2d Cir. 1994) (finding that the Board's reasoning would result in Solzhenitzn's dispute with the Soviet Union being characterized as literary rather than political). The message given is, let us not bother to determine what really went on during the period respondent remained in Bangladesh between Ershad's ouster and the time the respondent fled, just as we shall not bother to fairly consider what is at the root of the respondent's experiences. In either case, the respondent need not be considered for a grant of asylum if we can settle on a basis to deny his claim.

*Third, the rule of explaining on appeal.* Although the majority says they require only a convincing explanation for discrepancies and omissions, they have introduced, in effect, a super-burden. We already hold that the burden of proof is the respondent's. *See Matter of S-M-J-, supra; Matter of Y-B-, supra.* Now we hold that in the event he doesn't get a fair hearing in which the Immigration Judge follows the guidelines we have articulated in our precedent decision and seeks an explanation or assist the respondent in setting forth a consistent and coherent claim during the hearing, it is the respondent's fault if he does not present the explanations necessary to clarify discrepancies on appeal.

Now, I certainly do not disagree that it is appropriate for a respondent to provide explanations for discrepancies in the record. But the respondent may not be able to do so during the course of the hearing, because oftentimes the respondent is not aware that the Immigration Judge considers corrections or clarifications made in the course of testimony or on cross-examination to be inconsistencies that undermine the respondent's veracity. Rather, the respondent believes these changes are intended to set the record straight and that they will be taken as clarifying simple errors resulting from language, trauma, memory, confusion, anxiety, or any number of other impediments likely to be experienced by any asylum seeker.

The asylum seeker is not necessarily approaching the hearing with the understanding that the Immigration Judge or the Board is apt to think that he is fabricating his story—either from the outset, or once any discrepancy arises. Unaware that the Immigration Judge—or until recently the Board—will rely on these discrepancies, even if corrected, to deny the claim, the respondent may persist in the belief that because he responded to the questions presented and clarified the facts, providing the correct dates, his claim no longer contains discrepancies or requires explanations.

Moreover, although it certainly would be prudent for an appellant to make *legal* arguments in support of any challenge made to an adverse credibility finding, these are not *explanations*. Established Board precedent holds that statements made in a brief or pleading do not constitute evidence. *See Matter of Ramirez-Sanchez*, 17 I&N Dec. 503, 507 (BIA 1980). It also holds that we consider only the record made below and, with rare exceptions, do not accept or consider new information produced. *Matter of Fedorenko*, 19 I&N Dec. 57 (BIA 1984). I trust that in light of this decision, the majority is contemplating lifting those rules to accept reasonable explanations from asylum seekers who are now expected to provide such on appeal to the Board. I note, however, that the respondent in this case had no such notice that he should or could provide such explanations on appeal.

### III.  APPROPRIATE AND NECESSARY STEPS
### TO COMPLY WITH THE BOARD'S RULE

In my view, the Board's rule, while facially reasonable and certainly workable as used by federal circuit courts of appeal, imposes unreasonable and unrealistic expectations as applied, which conflict with accepted norms and guidelines for administrative asylum adjudications. Since our decisions are equally binding on represented and unrepresented asylum seekers alike, I feel it appropriate to warn and notify all asylum seekers directly concerning the practical requirements imposed by today's decision.[3]

First, do not, under any circumstances, make any false statements or simply sign off on an application prepared for you by someone else. Make certain that you understand and agree with each and every statement made in your asylum application before signing it.

If you have already submitted an application, or your case in on appeal to the Board, have someone help you to review it at the soonest possible moment. Make sure to correct any statements that are not accurate or true according to your own understanding and experience. If you need to correct any statements or any part of the application, make sure you also explain in detail in a sworn affidavit why you need to correct it. If you are not accustomed to explaining so much about the reasons that you do things, explain that.[4]

Second, in preparing your asylum claim, find someone who you can trust to tell the deepest and possibly the most painful secrets of your life. Search your memory, make notes, and check with others who shared your experiences to make sure of every detail, and state anything and everything of relevance that ever occurred relating to your claim of persecution in your initial application. Hire a translator, after a thorough screening of several candidates, who is going to translate every nuance of your statements and hire a second one to check the work of the first.

Make sure to articulate your story in a manner that would be best understood by a college educated adjudicator, because that is who will evaluate your claim. That is, be as articulate as possible, but do not use words that you cannot define, or allow whoever is representing you to use words other than those you yourself understand, because it is likely that you will be questioned about them during the hearing and if you cannot explain what they mean, your testimony will be discredited.

---

[3] The entire text in this section is written rhetorically, reflecting my own individual opinion for purposes of dissent, and does not constitute and should not be taken to constitute or to substitute for individual legal advice rendered by an accredited representative or licensed attorney.

[4] If your case is on appeal to the Board, it might be appropriate to file a "Motion to Amend and Correct the Record or to Remand," based on the decision in this case, including your affidavit containing your sworn corrections and explanations.

Third, to corroborate your claims, obtain and submit official documents or other evidence such as affidavits, letters, lab reports, certificates, and any other document that verifies your identity, your membership or affiliation, your beliefs, and any harm or threats of harm you experienced. This should include verification of your shock, terror, panic, fear, depression, sorrow, or grief, and your medical or hospital reports made at the time of any incidents involving arrest or physical harm, or other evidence that supports your story. Before submitting this evidence, have the letters or certificates checked both by a forensics expert and an expert familiar with the circumstances in your country. Get a sworn and notarized statement concerning the paper on which the information is written, the credentials of the person making the statement or certificate, and a description of how, where, and when official documents are issued, who prepares them, how, where, and when you got them, and, if possible, provide an explanation for any variance from the normal condition of the document, in terms of the ink used on the document, the seals stamped on the document, the condition of the paper, and how the documents were either taken out of the country or delivered to you.

No matter when the hearing took place or when the appeal was briefed, it appears that the claim will be expected to have been documented with identity documents, formal certificates or degrees, official government or medical records, contemporaneous news articles confirming the existence of associates, leaders, parties, demonstrations, insurrections, arrests, and detentions. A thorough appendix of corroborating documentation should probably also include not only the actual corroborating documents pertaining to the asylum applicant, but the identification papers, evidence of titles on official stationary, and perhaps additional official statements, corroborating the positions of those persons whose third party affidavits the applicant for asylum is submitting in support and corroboration of his own claim. *See, e.g., Matter of S-M-J-, supra* (Rosenberg, concurring).

Fourth, after you have explained your political views and your racial or tribal or family-based relationships, and after you have described each and every thing that happened to you or that hurt you or your family because of those views or relationships and made you fear persecution (including the dates when and where it happened and what anybody said and who else was there), make sure to include an explanation of why you applied for asylum when you did, particularly if it was sometime after you first arrived in the United States. If you had roommates or knew others who applied for asylum, make sure you explain why you did not do so at the same time or why you did not understand the process just because someone you knew was pursuing it. Make sure to explain how you felt about discussing your claim even with close friends or family, and if you hesitated in doing so, explain what made you hesitate.

In the event that you are illiterate or semi-literate, explain how you remember significant things like when certain births and deaths happen or

significant holidays, and tell us in as much detail as possible how you express the happening of these things. If you are illiterate or semi-literate or from a culture other than a Western one, make sure to explain whether the calendar used in the United States is the one used in your country, and make sure to explain whether you mark time by some other method such as significant religious holidays, or seasons of the year.

Fifth, at your hearing, be sure to testify about each and every item contained in your application, whether or not you are asked to do so on direct or cross-examination, or by the Immigration Judge. If the Immigration Judge resists hearing your testimony, make an "offer of proof"—meaning state on the record what you would prove if you were allowed to present evidence— making sure to advise the Immigration Judge while the tape recorder is turned on, "on the record," of what you *would* testify to if allowed to testify. If you have hired an attorney to represent you, make sure your attorney does all these things. In case the Immigration Judge does not allow you to present certain evidence or admits evidence about which you object, it is probably best for the attorney to file a "brief" or written document arguing what the law requires and why your evidence or your explanation should be considered.

Sixth, if you are appealing a denial of your asylum claim, in addition to explaining discrepancies that may be gleaned from the record once it is transcribed, it would be prudent not only to respond to, but to anticipate and address certain other possible concerns that you might not have had reason to know to explain in your original application, including, (1) why, if you did not apply for asylum immediately, you did not do so; (2) why, if you had roommates or acquaintances from the same country, particularly if they had applied for asylum, you waited to apply; (3) why, if you had relatives anywhere in the world, you did not obtain letters from them corroborating the fact of their nationality and the persecutory events that were threatened or occurred; (4) why, if you submitted letters from family or associates addressing the circumstances of their persecution or country conditions, these letters went beyond the typical "how are you/news from home" content that would be expected of such letters and addressed those topics; (5) why, if you had physical or psychological injuries, you did not obtain treatment before your flight or immediately after arrival in the United States; (6) why you have a passport or could not obtain a passport, or why you were able to obtain a passport once in the United States; and (7) why, if there was a lapse of time between the submission of your application form and the hearing, you did not review the form and specifically correct any errors, omissions, or discrepancies prior to the hearing, explaining of course, how the errors occurred, and why they were not discovered at the time of signing and submitting the application.

If your hearing already has concluded and your case is on appeal, make certain that you file a brief and provide all the explanations in your brief on

appeal. Even if you already have filed a brief, it may be possible to supplement it before the case is decided by filing the supplementary brief with a "Motion to Supplement Brief on Appeal" in light of this case. If your case already has been denied, it might be possible to have the decision reopened or reconsidered so your explanations can be considered, provided that you file the motion within the time limits imposed by statute and regulation and that the motion meets all the requirements set forth in the regulations.

Finally, if you have an attorney or had one who did not do all these things, find out why they were not done. Although every relationship with an attorney is an individual one between you, the client, and the attorney, these things are not special or unusual; attorneys representing people in asylum hearings are expected to do them. If you depended on your attorney to do these things and the attorney did not do them, prepare a statement with the help of someone else, send that statement to the attorney, and submit a copy of it to the bar association or licensing board for attorneys in your local area. Then send copies of all that information to the Immigration Judge (if your case was not appealed) or to the Board (if your case was appealed) with a motion to reopen claiming that you had "ineffective assistance of counsel." Be sure to indicate how your case was prejudiced because of what your attorney did or did not do.

## IV. CONCLUSION

If we wish to ensure the protection of legitimate asylum seekers according to our domestic and international commitments, we cannot allow either the development of a competent and professional Immigration Judge corps, our concerns about fraudulent asylum claims, or the demands of an overwhelming appellate docket to dictate our imposing an effective presumption of fabrication on every asylum seeker, or to rationalize limiting appellate review by this Board. That having been said, I recognize that the majority of this Board does not believe that we impose an objectionable presumption or improperly shy away from our appellate review responsibilities, or that the instant decision frustrates or will frustrate legitimate asylum claims. I hope that they will be proved correct, and that my foreboding will be proved wrong. In the meantime, I dissent.